[Civ. No. 45176. Second Dist., Div. One. Aug. 10, 1977.]

E. M. GHERMAN et al., Plaintiffs and Respondents, v.
RICHARD D. COLBURN et al., Defendants and Appellants.

546

548

## Counsel

Beardsley, Hufstedler & Kemble, Abbott & Hemmerling, Jackson & Goodstein and Seth M. Hufstedler for Defendants and Appellants.

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Laurence F. Jay, Williams & Williams and Ernest George Williams for Plaintiffs and Respondents.

## Opinion

**LORING, J.,**\*—Dr. E. M. Gherman, M.D. (Gherman), John A. Patterson (Patterson), and Laurie Lane Corporation, a California corporation, filed (on Oct. 13, 1970) a third amended complaint[1] against Richard D. Colburn (Colburn), Rolled Alloys, a Delaware corporation, and Big Bear Properties, Inc., a Delaware corporation, and other defendants[2] for: "(1) Damages for tortious exclusion of joint venturer and punitive damages; (2) For dissolution of joint venture, accounting and a receiver; (3) For declaratory relief; (4) Fraud." On August 31, 1973, plaintiffs filed[3] a request for partial dismissal requesting the dismissal of the second cause of action ("For dissolution of joint venture and a receiver") and the third cause of action ("For declaratory relief"). Trial commenced on October 2, 1973, and on that date defendants filed a written motion requesting leave to file a cross-complaint seeking a judicial dissolution and accounting, which was denied on October 4, 1973. After 34 days of trial and 4 days of deliberation, the jury returned a verdict in favor of the named plaintiffs against the named defendants in the sum of $1,256,845, with interest at 7 percent per annum from June 1, 1969, which amounted to an additional $395,906.18. The jury assessed punitive damages against Colburn at zero dollars. Defendants appeal from the judgment.

---

\*Assigned by the Chairperson of the Judicial Council.

[1]The defendants answered the third amended complaint on which pleading the case went to trial.

[2]We disregard other defendants not included in the ultimate judgment.

[3]An affidavit of service attached to the request for dismissal indicates that a copy thereof was served on defense counsel on August 31, 1973. A separate notice of dismissal was also served on defense counsel on August 31, 1973. Appellants assert that the clerk did not physically file the request for dismissal until September 19, 1973, at which time it was filed nunc pro tunc as of August 31, 1973. Appellants do not deny receiving the service copy and notice of dismissal in due course of the mails after August 31, 1973. They claim to have been in doubt as to whether or not the dismissal would be filed until

## ISSUES

In their closing brief on appeal, appellants state: "Defendants do not dispute the existence of evidence to support a finding of joint venture, but do vigorously urge that but for the errors here urged a different result would have obtained."[3a] The alleged errors referred to consist of the denial of defendants' motion to file a cross-complaint for a nonjury judicial dissolution and an accounting, errors in the admission and rejection of evidence and erroneous instructions and failure to correctly instruct the jury on the law applicable to the case. These alleged errors will be hereafter defined and discussed in detail.

## FACTS[4]

In 1968 Bear Valley Mutual Water Company decided to sell approximately 2,600 acres of land owned by its wholly owned subsidiary, Big Bear Development Company, located at Big Bear Lake, California. The property had been appraised at $5,019,350 (exh. A). On November 17, 1968, Big Bear Development Company entered into an escrow with Deane Bros., a division of Occidental Petroleum Corporation, to sell the acreage. Gherman and Patterson negotiated with Colburn to form a joint venture to purchase 1,400 of the 2,600 acres from Deane Bros. Under the terms of the joint venture, title to the 1,400 acres was to be taken in the name of a corporation to be formed for that purpose, which would be a subsidiary of a corporation owned by Colburn. The proposed price for the 1,400 acres was $5,450,000 payable on certain time payments. Laurie Lane, a corporation controlled by Gherman, was to guarantee Colburn against loss and to market the property after it was acquired. Profits were to be split 75 percent to the Colburn group, 25 percent to the Gherman/Patterson group. Colburn made an offer on that basis to Deane with a $50,000 deposit.

---

September 20, 1973. However between the period September 1, 1973, to September 13, 1973, appellants were apparently not aware that the dismissal had not been filed on August 31, 1973.

[3a] On motion for nonsuit defense counsel admitted that there was substantial evidence to support findings: (1) that there was a joint venture and, (2) the joint venture was repudiated. His sole contention in support of said motion was that there was no evidence to support a finding of damages.

[4] In view of appellants' admission that the evidence was sufficient to support the jury's implied finding of a joint venture, we summarize only that portion of the evidence which is relevant to a consideration of the issues presented. In accordance with established appellate principles, we summarize the evidence in the light most favorable to respondents.

That proposed purchase was never consummated because Deane's escrow with Big Bear Development Company was terminated before completion and Deane Bros. never acquired title.

The parties to the joint venture then undertook negotiations with Big Bear Development Company to directly purchase the entire 2,600-acre parcel for $4 million cash. Since Colburn was required to put up $4 million cash, he requested that the terms of the joint venture be changed to provide him with additional consideration. The parties to the joint venture mutually agreed that after deduction of expenses Colburn should receive 20 percent per annum after taxes from first profits and that the remaining profits should be split 50 percent to the Gherman/Patterson group and 50 percent to the Colburn group. In order to keep the 20 percent factor as low as possible it was agreed that after acquiring title the property would be marketed as soon as possible which hopefully would be within one year.

On January 7, 1969, the escrow to acquire the 2,600-acre parcel for $4 million was closed and title to the 2,600-acre parcel was taken in the name of Big Bear Properties, Inc., a Delaware corporation, a wholly owned subsidiary of Rolled Alloys (wholly owned and controlled by Colburn), which Colburn had formed on December 30, 1968, for the purpose of taking title. While the escrow was pending and after it was closed, Gherman/Patterson formulated plans for marketing the property, which were presented to and approved by Colburn. Plaintiffs expended $10,000 of their own money in efforts to subdivide and market the property and devoted approximately 40 hours a week of their time and effort for several months. Plaintiffs also attempted to wholesale the property or portions of the property to large developers. Plaintiffs ultimately obtained a firm offer from G. F. Industries, a Dallas conglomerate, to purchase 1,423 acres of the total 2,600-acre parcel at a price of $8.6 million payable over a 10-year period with interest at 8.5 percent. There was evidence that plaintiffs had generated interest in Macco Corporation to obtain an option to purchase the same 1,423 acres at a purchase price of $8.4 million. About March 17, plaintiffs also outlined to defendants the terms of a proposed sale to Rancho Bernardo which would have produced a profit of $5 million to the joint venture. Shortly thereafter defendants denied the existence of a joint venture and denied that plaintiffs had any interest in the 2,600 acres of land. The parties then dealt with each other through their respective lawyers.

Thereafter several lawsuits,[5] including the instant lawsuit were filed.

## DISCUSSION

Both sides impliedly invite us to join them in a quagmire of erudite, esoteric quicksand searching for the abstract philosophical theories and labels of law and equity applicable to this action. We decline to do so because in the trial court both sides joined in requesting the court to submit an instruction to the jury defining the factual issues to be tried in simple concise language devoid of the complexity now created. That *joint* instruction reads: "In this action the plaintiffs have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: [¶] No. 1. That plaintiffs and defendants entered into an oral agreement of joint venture with respect to the acquisition and sale of certain property located at or near Big Bear Lake, California, including a provision that if the property was sold the proceeds of such sale or sales, including the profits, if any, were to be distributed as follows: [¶] First, payment of the costs and expenses of the venture including the costs of such sale or sales. [¶] Next, payment to the defendants of all sums advanced by them to the venture in respect to the cost of purchase or acquisition of the property. [¶] Next, payment to defendants of a sum equal to 20 percent per annum net after taxes on their outstanding investment. [¶] Next, the balance, if any, to be paid in equal shares to plaintiffs and defendants. [¶] No. 2. That plaintiffs performed what was required of them by the terms of said agreement, or that they were prevented or excused from doing so by the wrongful act of defendants in repudiating or breaching said agreement. [¶] No. 3. That defendants wrongfully repudiated or breached the agreement and converted all of the joint venture assets to themselves and excluded plaintiffs therefrom. [¶] No. 4. That as a result of the foregoing plaintiffs suffered damages."[6]

---

[5]Two lawsuits with lis pendens were filed in San Bernardino County. One resulted in the decision of *Gherman* v. *Colburn* (1971) 18 Cal.App.3d 1046 [96 Cal.Rptr. 424]. It was ultimately held that plaintiffs had no right to file lis pendens because they asserted no direct interest in the land. The two San Bernardino County actions were ultimately dismissed without prejudice.

[6]The remainder of the instruction in the words of BAJI No. 2.60 reads: "By a preponderance of the evidence is meant such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth. In the event that the evidence is evenly balanced so that you are unable to say that the evidence on either side of an issue preponderates, then your finding upon that issue must be against the party who had the burden of proving it. [¶] In determining whether an issue has been proved by a preponderance of the evidence, you should consider all of the evidence bearing upon that issue regardless of who produced it."

By that joint instruction the parties impliedly agreed that there was no issue on which defendants had the burden of proof. In our view a *jointly* requested jury instruction defining the issues to be tried and decided by the jury ought to have at least the same legal stature and dignity of a joint pretrial statement of the issues to be tried.

When the jury rendered a verdict in favor of plaintiffs under that jointly requested instruction, the jury impliedly made an affirmative finding on each of the four issues of fact set forth in the joint instruction. The jury, therefore, found as a fact that there was a joint venture agreement between plaintiffs and defendants; that by the terms thereof, the proceeds therefrom were to be divided in the manner indicated; that defendants wrongfully repudiated or breached the agreement *and converted all of the joint venture assets to themselves and excluded plaintiffs therefrom* which caused plaintiffs damage in the sum of $1,256,845. Those implied findings of fact, which appellants now admit are supported by substantial evidence, support the judgment herein whatever legal or equitable theory or labels may be applied to the action. The judgment should be affirmed if the trial was free from prejudicial error, which is the point to which we now address ourselves.

### 1. Did the court err in denying defendants' motion for leave to file a cross-complaint?

Appellants contend that there can be but one form of action between partners[7] —an action for judicial dissolution and accounting under Corporations Code section 15038—and, therefore, their proposed cross-complaint for an accounting was in effect a compulsory counterclaim under former Code of Civil Procedure section 439, the filing of which is mandatory, and, therefore, the trial court had no choice or discretion but to grant their motion for permission to file.

The argument assumes too much for two reasons: (1) as we discuss in more detail, *infra,* an action for judicial dissolution and accounting is not the only permissible action between partners. There is at least one important exception: where one partner excludes the other, repudiates the very existence of the partnership and converts all of the partnership assets, the victim may sue for damages without seeking judicial dissolution and an accounting. (*Laughlin* v. *Haberfelde* (1946) 72 Cal.App.2d 780 [165 P.2d 544]; *Crosby* v. *McDermitt* (1857) 7 Cal. 146;

---

[7]Since the legal distinction between a partnership and joint venture is well known, we use the terms interchangeably to apply to the relationship between the parties here.

*Driskill* v. *Thompson* (1956) 141 Cal.App.2d 479 [296 P.2d 834]; *Prince* v. *Harting* (1960) 177 Cal.App.2d 720, 736 [2 Cal.Rptr. 545]; *Moropoulos* v. *C.H. & O.B. Fuller Co.* (1921) 186 Cal. 679 [200 P. 601]; *Wilson* v. *Brown* (1929) 96 Cal.App. 140 [273 P. 847]; *Johnstone* v. *Morris* (1930) 210 Cal. 580 [292 P. 970]; *James* v. *Herbert* (1957) 149 Cal.App.2d 741 [309 P.2d 91]; *Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272 [55 Cal.Rptr. 610].) The reason for the exception is obvious: the guilty partner has breached (i.e., repudiated) the basic agreement which created the partnership. He denies the very existence of a partnership. (This is to be distinguished from a situation in which the guilty party recognizes the existence of a partnership but breaches some obligation in the performance of the partnership agreement not amounting to wrongful dissolution in contravention of the agreement.) Plaintiffs here claim to come within that exception. ■ (2) The law does not deprive the court of choice or discretion where a defendant seeks to file a so-called compulsory cross-complaint which is not timely and which is not filed in good faith. The statute[8] impliedly provides that if the claim is not timely asserted it is thereafter barred.

■ Appellants argue that their effort to file a cross-complaint was timely for two reasons: (1) so long as plaintiffs sought an accounting it was unnecessary for defendants to do so and, (2) they did not learn that plaintiffs had dismissed their cause of action for an accounting until the commencement of the trial, at which time they promptly requested permission to file the "compulsory" cross-complaint. Appellants are wrong on both points. It is not legally correct that the defendants were not required to seek a judicial dissolution and accounting as long as plaintiffs were doing so. A· plaintiff has a right to know what a defendant's defenses to the action are the same as the defendant has a right to know what causes of action a plaintiff asserts. Until the first day

---

[8]Appellants cite former Code of Civil Procedure section 439 (which was repealed effective July 1, 1972). Former Code of Civil Procedure section 439 read: "If the defendant omits to set up a counterclaim upon a cause arising out of the transaction set forth in the complaint as the foundation of the plaintiff's claim, neither he nor his assignee can afterwards maintain an action against the plaintiff therefor."

The statute which governed at trial was Code of Civil Procedure section 426.30 which reads: "(a) Except as otherwise provided by statute, if a party against whom a complaint has been filed and served fails to allege in a cross-complaint·any related cause of action which (at the time of serving his answer to the complaint) he has against the plaintiff, such party may not thereafter in any other action assert against the plaintiff the related cause of action not pleaded. [¶] (b) This section does not apply if either of the following are established: [¶] (1) The court in which the action is pending does not have jurisdiction to render a personal judgment against the person who failed to plead the related cause of action. [¶] (2) The person who failed to plead the related cause of action did not file an answer to the complaint against him."

of trial, defendants' sole legal defense was that no joint venture existed or ever existed. At the last minute defendants changed their position and sought to establish an alternative defense—judicial dissolution and an accounting—which presupposes the existence of a partnership and which was diametrically opposed to the position which they had taken throughout all of the pretrial stages of the case. Defendants were chargeable with knowledge that there was always a legal possibility that plaintiffs would do precisely what they did—dismiss the accounting cause of action—and a cautious pleader would anticipate such a possibility and take a forthright position from the outset that if a joint venture is established, that there should be an accounting. It is untrue that defendants did not learn of plaintiffs' dismissal of the accounting cause of action until the commencement of trial. The clerk's record discloses that defendants had at least 30 days' notice prior to trial of plaintiffs' dismissal, or at least attempted dismissal of the accounting cause of action. But during that 30-day period, defendants took no action to obtain permission to file a cross-complaint until the first day of trial. It is true that Code of Civil Procedure section 426.50[9] requires the court to grant a defendant's application for permission to file a cross-complaint ". . . at any time during the course of the action. . . . *if* the party who failed to plead the cause acted in good faith." (Italics ours.) However, the statutory terminology allows the court some modicum of discretion in determining whether or not a defendant has acted in good faith. Where the defendant fails to act for a period of over 30 days and waits until the first day of trial, such conduct may be interpreted as evidence of a lack of good faith *especially* when coupled with the long history of litigation between the parties, which demonstrates that both sides were jockeying for position over the right to a jury trial. Plaintiffs wanted a jury trial; defendants did not. Plaintiffs dismissed their original San Bernardino County action (without prejudice) because the court there had ruled that they were not entitled to a jury trial (see *Gherman* v. *Colburn, supra*). The court here could well have concluded that the defendants' eve of trial change of position relative to the existence of a joint venture was not in good faith but a strategic effort to deprive plaintiffs of their right to a jury

---

[9]Code of Civil Procedure section 426.50 reads: "A party who fails to plead a cause of action subject to the requirements of this article, whether through oversight, inadvertence, mistake, neglect, or other cause, may apply to the court for leave to amend his pleading, or to file a cross-complaint, to assert such cause at any time during the course of the action. The court, after notice to the adverse party, shall grant, upon such terms as may be just to the parties, leave to amend the pleading, or to file the cross-complaint, to assert such cause if the party who failed to plead the cause acted in good faith. This subdivision shall be liberally construed to avoid forfeiture of causes of action."

According to Shepard's citator, Code of Civil Procedure section 426.50, which became effective July 1, 1972, has never been cited by any California case.

trial on the factual issue of the existence of a joint venture, defendants' repudiation thereof and damages flowing therefrom. Since as an appellate court, we are required to indulge in presumptions in favor of the regularity of the rulings of the trial court, we conclude that the trial court impliedly found and concluded that by attempting to file a cross-complaint on the first day of trial, defendants were not acting in "good faith" but that the motion for leave to file a cross-complaint was merely a tactical, strategic maneuver to deprive plaintiffs of a right to a jury trial. In our view such an implied finding satisfied the requirements of Code of Civil Procedure section 426.50.

■ Assuming, without deciding, that the court below committed error in denying defendants' request for permission to file a cross-complaint, we conclude that the alleged error was nonprejudicial in view of the fact that plaintiffs elected to seek *only* damages rather than establish an interest in a going partnership. If plaintiffs failed in that effort, then there would be an adjudication that there was no joint venture and therefore no right to or need for an accounting. When plaintiffs dismissed their cause of action for an accounting, they did defendants a favor, since they reduced their prospects to one shot instead of two. As we subsequently discuss in more detail, under Corporations Code section 15038[10] the rights referred to therein are cumulative. Where the rights of creditors or other third parties are not involved, we see no legal reason why a joint venturer may not waive one of the two cumulative causes of action. If plaintiffs wanted to waive their rights as joint venturers to a judicial dissolution and accounting and enforce solely their statutorily recognized cause of action for breach of contract and damages, we see no legal reason why they could not do so.

■ The cross-complaint issue really hinges on the question of whether or not plaintiffs' cause of action came within the aforesaid

---

[10] The material parts of Corporations Code section 15038 read: "(1) When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners. But if dissolution is caused by expulsion of a partner, bona fide under the partnership agreement and if the expelled partner is discharged from all partnership liabilities, either by payment or agreement under Section 15036(2), he shall receive in cash only the net amount due him from the partnership. [¶] (2) When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows: [¶] (a) Each partner who has not caused dissolution wrongfully shall have, [¶] I. All the rights specified in paragraph (1) of this section, and [¶] II. The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement."

exception to the general rule that there can be but one form of action between partners—judicial dissolution and an accounting—a question to which we now address ourselves in more detail.

It is clear that it has been the statutory law of California at least since the adoption of former Civil Code section 2432[11] in 1929 (Stats. 1929, ch. 864, p. 1908) that the rule that there can be but one form of action between partners—judicial dissolution and accounting—has been subject to one statutory exception: when the dissolution is "in contravention of the partnership agreement, . . ." then the innocent partner has "[T]he right [i.e., a cause of action] . . . against each partner who has caused the dissolution wrongfully, [i.e., in contravention of the partnership agreement] to damages *for breach of the agreement.*" (Italics ours.) That same exception has been carried forward verbatim in California statutory law since 1929 and is now expressed in Corporations Code section 15038. Section 15038 likewise recognizes the right of the innocent partner "to damages *for breach of the agreement*" under the exceptions delineated. (Italics ours.) Corporations Code section 15038 applies to joint ventures. (*Zeibak* v. *Nasser* (1938) 12 Cal.2d 1 [82 P.2d 375].)

In *Laughlin* v. *Haberfelde, supra,* 72 Cal.App.2d 780, 789, the court cited with approval *Crosby* v. *McDermitt, supra,* 7 Cal. 146, indicating that at that very early date in California history (1857) as a matter of common law principles even without a statute, when a partner wrongfully repudiates a partnership agreement, converts the partnership assets and wrongfully expels the innocent partner, the victim may sue for damages "under the peculiar circumstances of this case" and is not limited to the usual action for a judicial dissolution and an accounting between partners. As noted since that date (1857), the California cases have consistently recognized the same principle, which is merely a statement of general partnership law. In *Zimmerman* v. *Harding* (1912)

---

[11]The material parts of former Civil Code section 2432 read: "(1) When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners. But if dissolution is caused by expulsion of a partner, bona fide under the partnership agreement, and if the expelled partner is discharged from all partnership liabilities, either by payment or agreement under section 2430 (2), he shall receive in cash only the net amount due him from the partnership. [¶] (2) When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows: [¶] (a) Each partner who has not caused dissolution wrongfully shall have [¶] I. All the rights specified in paragraph (1) of this section, and [¶] II. The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement."

227 U.S. 489, 494-495 [57 L.Ed. 608, 611, 33 S.Ct. 387], the United States Supreme Court speaking of general principles of partnership law, said: "Neither is the remedy [for judicial dissolution and an accounting] in equity for a breach of a partnership agreement exclusive. There may be *at law* a recovery of all the damages which result, *including damages for profits prevented by a wrongful dissolution.* Thus, if one member assumes to dissolve a partnership before the end of the term, the other may bring an action for damages for the breach and recover not only his interest, *but also his share of the profits which might have been made during the term.* He need not wait until the expiration of the period and need not go into equity for an accounting, *but may at law show the probable profits which he has been deprived of. Bagley* v. *Smith,* 10 N.Y. 489; *Dennis* v. *Maxfield,* 10 Allen (Mass.) 138; *Karrick* v. *Hannaman,* 168 U.S. 328, 337." (Italics ours.) In our view the aforesaid exception in Corporations Code section 15038 is merely a codification of that well established general principle.

In *Laughlin* v. *Haberfelde, supra* (p. 789), the court pointed out that former Civil Code section 2432 which recognized the right of the innocent partner to an action for damages for breach of contract (under the defined exception) contained *"no express limitation as to the form of the action in which the additional right may be enforced."* (Italics ours.) In *Wilson* v. *Brown, supra,* the additional form of action was an action for damages for *conversion* of the partnership property. In an action for conversion the measure of damages would be the value of the property at the time of the conversion or the amount necessary to indemnify for the loss including costs of pursuit. (Civ. Code, § 3336.) In *Boyd* v. *Bevilacqua, supra,* the action was an action for damages for tortious conduct. In an action in tort the measure of damages "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.) In an action for breach of contract the measure of damages for breach "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) Except on the issue of interest under Civil Code section 3288, we see very little, if any, practical distinction between the measure of damages in an action ex delicto (Civ. Code, § 3333) and an action ex contractu (Civ. Code, § 3300).

In *Pepitone* v. *Russo* (1976) 64 Cal.App.3d 685 [134 Cal.Rptr. 709], the court said (pp. 688, 689): " . . . California law is committed to the view

that the fraudulent breach of fiduciary duty is a tort, and the faithless fiduciary is obligated to make good the full amount of the loss of which his breach of faith is a cause [citations]. In accordance with this general principle, the cases hold that while the fraudulent property transactions between a vendor and vendee are governed by the special 'out-of-pocket-loss' rule espoused in section 3343 [citations], *where,* as here, *the defrauding party stands in a fiduciary relationship to the victim of fraud, the damages must be measured pursuant to the broad provisions of sections 3333 and 1709 regulating compensation for torts in general* [citations]. The cases amplify that the measure of damages provided by the foregoing sections is substantially the same as that for breach of ontract prescribed by section 3300; i.e., it tends to *give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been had the promisor performed* the contract [citations]." (Fn. omitted; italics in original.)

It is clear that an action for damages is maintainable here without an action for judicial dissolution and an accounting. It is equally clear that conversion is an element of the cause of action, but that does not automatically mean that the measure of damages is the measure of damages in a conversion action. The result depends upon which theory plaintiff elects to proceed on. Although again under the facts of this case, there would appear to be little practical difference in the measure of damages.

It is true that California cases have held that one partner may not file an action at law (other than an action in equity for judicial dissolution and accounting) against a partner. (See *Malott* v. *Seymour* (1950) 101 Cal.App.2d 245, 246 [225 P.2d 310]; *Mosher* v. *Helfend* (1935) 7 Cal.App.2d 48, 51 [44 P.2d 1050]; *Cunningham* v. *deMordaigle* (1947) 82 Cal.App.2d 620, 621 [186 P.2d 423]; *Hosking* v. *Spartan Properties, Inc.* (1969) 275 Cal.App.2d 152, 156 [79 Cal.Rptr. 893].) We do not believe that those cases stand for the proposition that there cannot be an action ex contractu under the circumstances presented in this case since the statute (former Civ. Code, § 2432 and now Corp. Code, § 15038) expressly provides that there may be an action for "damages for breach of agreement" under these circumstances. In our view those cases deal with alleged breach of contract in the performance of the partnership agreement, not amounting to a wrongful dissolution. They do not deal with breach of contract in the sense that there has been a *repudiation* of the basic concept—a denial of the very existence of a partnership or joint venture relationship in any form or at any time and a conversion of the

partnership assets. It is regrettable that the words "breach" and "repudiation" are sometimes used interchangeably, but there is a technical difference. According to Black's Law Dictionary (rev. 4th ed. 1968), a "breach of contract" is the "failure, without legal excuse, to perform any promise which forms the whole or part of a contract" whereas according to the same authority "repudiation" means the "rejection; disclaimer, renunciation; . . . of a duty or relation." When read in its entirety, Corporations Code section 15038 in speaking of wrongful dissolution of the partnership and expulsion of a partner in "contravention of the agreement" creating the "right" to damages for "breach of the agreement" we believe that the Legislature was using the word "breach" in the sense of "repudiation." The word "breach" obviously relates back to the word "contravention" and we interpret the word contravention to include a repudiation. It is clear that in the case at bar plaintiffs were proceeding on the theory of a repudiation of the existence of the contract creating a partnership or joint venture rather than on the theory of a breach in the performance of the terms of the partnership or joint venture agreement after the partnership or joint venture came into existence. Under such circumstances this action was maintainable without an action for judicial dissolution and an accounting under the exception provided in Corporations Code section 15038. Such an action is not an action between partners but an action between contracting parties, one of whom has breached the contract.

■ In our view it is axiomatic that every contract contains an implied covenant of good faith (*Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367]) and implied within that covenant is a covenant that there will not be a denial of the existence of the contract because in every contract there is an implied promise "not to do anything which prevents realization of the fruits of performance." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 576, p. 493.) It is for breach of that covenant that plaintiffs may maintain an action for damages for what in ultimate effect is a repudiation of the agreement.

In our view it is also axiomatic that where a civil wrong gives rise to two or more causes of action, the choice of remedy is vested in the victim, not in the wrongdoer. ■ Where a partner or joint venturer wrongfully repudiates the partnership or joint venture agreement and converts the assets of the partnership or joint venture to his own use and benefit, the victim at least has alternative[12] remedies: he may waive the

---

[12]Under Corporations Code section 15038 they are actually cumulative remedies, but in our case plaintiffs waived their right to an accounting.

tort or breach and sue to specifically enforce the partnership or joint venture agreement, including the remedy of a judicial dissolution and an accounting and if necessary (as an auxiliary remedy) to impress a trust on partnership or joint venture property, or the victim may submit to the repudiation and sue for damages for conversion of his interest in joint venture assets (see *Wilson* v. *Brown, supra*); or the victim may submit to the repudiation and sue for damages for breach of the joint venture agreement (including "profits which might have been made") the same as any other action for damages for breach of any other contract (Corp. Code, § 15038, subd. (2)(a) II; *Fisher* v. *Hampton* (1975) 44 Cal.App.3d 741, 746 [118 Cal.Rptr. 811]) or he may sue in tort *(Boyd* v. *Bevilacqua, supra). It does not lie in the mouth of the wrongdoer to demand that his victim be limited to that cause of action which is most beneficial to the wrongdoer.*

A plaintiff may plead cumulative or inconsistent causes of action. When plaintiffs here dismissed the action for judicial dissolution and an accounting, plaintiffs made an election of remedies to sue for damages (either in tort or for breach of contract) and thereby removed accounting as a possible issue in the case.

This conclusion does defendants no injustice. After all defendants are the ones who wrongfully repudiated the existence of a partnership or joint venture. Having done so, they can hardly complain that their repudiation has been accepted by plaintiffs at face value. Defendants cannot complain of the failure to order an accounting of a partnership or joint venture which they say is nonexistent where the nonexistence is attributable solely to their wrongful conduct. Defendants should not be permitted to say, which by their motion to file a cross-complaint they in effect attempted to say, we repudiate the contract, but then if we do not get away with it, we repudiate our repudiation and demand an accounting. A repudiation is, by its inherent nature, irretrievable after an action is filed. (*Crown Prod. Co.* v. *Cal. Food etc. Corp.* (1947) 77 Cal.App.2d 543, 551 [175 P.2d 861].) That is not to say that a defendant may not plead inconsistent defenses, but the election of remedies is with plaintiffs and once they elected not to assert any partnership rights and to stand solely on the cause of action arising out of the repudiation, then as between the parties the cause of action for judicial dissolution and an accounting in equity became moot.

█ Consequently, we find no prejudicial error in the denial of defendants' motion for leave to file a cross-complaint to seek a judicial

dissolution and an accounting inasmuch as an accounting was no longer relevant once plaintiffs made their election of remedies. *If the partnership or joint venture had sustained losses that fact, if it was a fact, was a factor to be considered in the measure of plaintiffs' damages, a point which will be hereafter discussed. (Infra, p. 578.)*

■ At oral argument in this court, appellants placed great emphasis on their contention that if we affirm this judgment we will be creating a "new type of tort heretofore unknown to California law" because Colburn never really repudiated the joint venture but only made a "good faith assertion of a legal position" (that he believed that a joint venture did not in fact exist), which is now known to have been an erroneous legal position in the light of the jury's adverse verdict. Appellants argue that Colburn was only guilty of a "good faith breach of fiduciary duty" for which, appellants necessarily impliedly conclude, Colburn has no civil liability. Appellants rely on exhibit 49, a letter from Colburn's lawyer to Gherman's lawyer asserting such legal position and suggesting an action for declaratory relief. There are at least two answers to this argument: (1) defense counsel conceded in the court below (on a motion for nonsuit) that there was substantial evidence to sustain a finding of repudiation and appellants' present contention to the contrary constitutes a change of position and, (2) more importantly, there was additional evidence, other than exhibit 49, that Colburn repudiated the joint venture. Colburn testified that in April 1969 he instructed his lawyer Jackson to call Pratte (Gherman's lawyer) and tell him that Gherman/Patterson had no interest in the joint venture or the Big Bear property. Jackson testified that at Colburn's instructions he instructed Pratte to tell Gherman/Patterson not to go around the community telling people that they had any interest in the property.

Furthermore, whether or not exhibit 49 was merely a good faith assertion of a legal position is a question of fact for jury interpretation. The letter contains, inter alia, the following unqualified categorical statements: " . . . There exists no 'Colburn-Gherman joint venture'; Big Bear Properties, Inc. holds title to the property in question neither as nominee nor trustee, nor for the benefit of any entity other than itself; . . . [¶] I clearly recall asking that you instruct your clients to cease any dealings purportedly on behalf of Mr. Colburn or Big Bear Properties, Inc. and to cease representing that they had any interest in the subject property. . . ." The jury, within the scope of its fact finding power, could well have concluded that the foregoing statements were more than merely "statements of a legal position" but constituted statements of

ultimate fact constituting a repudiation of the joint venture. Appellants' argument is predicated on an interpretation of exhibit 49 which is most favorable to appellants. We are required to interpret exhibit 49 in the light most favorable to respondents. We, therefore, conclude that the jury interpreted exhibit 49 not as a mere statement of legal position but as a repudiation of the joint venture.

By its verdict the jury impliedly found that issue No. 3 of the jointly requested instruction (*ante*, p. 556) was true; i.e., "That defendants wrongfully repudiated or breached the agreement and converted all of the joint venture assets. . . ." The jury did not find that defendants were guilty of "only a good faith breach of fiduciary duty." We cannot embrace appellants' argument without redeciding an issue of fact which we have no power to do. An affirmance of the judgment herein, therefore, will not and does not create a "new type of tort" as appellants contend.

### 2. Did the court err in instructing the jury on the proper theory of the case and the measure of damages?[13]

Appellants argue that the court erroneously instructed the jury that plaintiffs must prove: "[¶] That defendants wrongfully repudiated or breached the agreement and converted all of the joint venture assets to themselves and excluded plaintiffs therefrom."[14]

■ Appellants quote the foregoing from the reporter's transcript. A reference to the clerk's transcript (p. 1221) demonstrates, as already noted, that the instruction was *jointly* requested. Consequently, the claim of error may not be raised since it comes within the doctrine of invited error. A party may not complain of the giving of instructions which he has requested. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 267, p. 4258.) In addition to the principl of invited error, we conclude that the instruction was not erroneous in any event. ■ Appellants' claim of error is predicated on the premise that there can be no *conversion* of real

---

[13]In normal chronology we would consider questions regarding the admission of evidence prior to questions regarding instructions but both questions involve the same basic concept of the theory of action so we depart from the usual sequence because appellants have done so.

[14]Appellants also claim error in the giving of the following instruction which was requested by plaintiffs: "If a joint venture exists between parties, it is a breach of duty arising out of the joint venture relationship for one party to acquire the property of the joint venture to the exclusion of the other party. The party so acquiring the property is liable to the other party for such breach of duty."

property and that the term "conversion" applies only to personal property. While normally, *at law*, it may well be true that a person may only convert personal property and may not be guilty of conversion of real property, that is not true *in equity* where the person guilty of conversion is the holder of legal title to the real property and his victim has at most only an equitable title or right. Here legal title to the 2,600-acre parcel was vested of record in the name of Big Bear Properties, Inc., a Delaware corporation, a wholly owned subsidiary of Rolled Alloys, a Delaware corporation, which was wholly owned and controlled by Colburn. Plaintiffs claimed in effect, and the jury impliedly found, that under the terms of the joint venture agreement legal title to the 2,600-acre parcel was held by Big Bear Properties, Inc., as nominee for the joint venture and therefore in trust,[15] for the use and benefit of the joint venture and when defendants repudiated that fiduciary obligation they thereby became obligated to pay plaintiffs damages in the form of money. In our view that constitutes a conversion *in equity*. Black's Law Dictionary (rev. 4th ed.) defines "conversion" as follows: "Equity. The exchange of property from real to personal or from personal to real, which takes place under some circumstances in the consideration of the law, such as, to give effect to directions in a will or settlement, or to stipulations in a contract, although no such change has actually taken place, [citations] and by which exchange the property so dealt with becomes invested with the properties and attributes of that into which it is supposed to have been converted. [Citations]."

In *Comstock* v. *Fiorella* (1968) 260 Cal.App.2d 262 [67 Cal.Rptr. 104], the court said (p. 266): "The partnership interest held by a copartner is treated in equity as personalty, *(Bastian* v. *Bastian,* 215 Cal. 662, 668 [12 P.2d 627]; *Bates* v. *Babcock,* 95 Cal. 479, 487 [30 P.2d 605, 29 Am.St.Rep. 133, 16 L.R.A. 745].) In *Bates, supra,* the court treated the partner's interest as personalty notwithstanding that the partnership property was realty. This doctrine was approved in the *Bastian, supra,* case."

When defendants repudiated the existence of a joint venture, denied that plaintiffs had any equitable right or title in the 2,600-acre parcel and claimed the entire parcel for defendants' exclusive benefit, defendants converted plaintiffs' equitable title in real property to personal property in the form of a right to a money judgment for damages and when defendants denied and repudiated their obligation to pay those damages,

---

[15]We need not now concern ourselves with the question of whether the alleged trust was express, constructive or resulting. For our purposes, the result would be the same in any event.

they, in effect, converted plaintiffs' personal property to their own use and benefit. Plaintiffs might have sued to impress a trust[16] on the real property. Instead they elected to seek a money judgment. A conversion within the concept of equity, therefore, occurred. Under these circumstances, it is not true that the exception delineated in Corporations Code section 15038 may not be asserted where the joint venture assets consist of real property. It may well be true that the court did not spell out precisely these abstruse, equitable and legal theories in its instructions to the jury, but it is equally true that it was not requested to do so. The parties obviously impliedly agreed by their jointly requested instruction to use the word "conversion" in a shorthand sense.

Appellants argue that plaintiffs had *no present interest* in the 2,600-acre parcel. That was an issue of fact which the jury impliedly resolved against appellants in the court below.

██ Appellants argue that plaintiffs could not recover on a fraud theory because plaintiffs' fourth cause of action (for fraud) was dismissed at the close of plaintiffs' case when the court indicated that it would grant a nonsuit with respect thereto. However, the first cause of action (on which plaintiffs prevailed in the court below) also alleged that what defendants did was done to cheat, defraud and deprive plaintiffs of their interest in the joint venture business, and to that end defendants have caused all of the assets of said joint venture to be transferred fraudulently and without consideration to themselves. The first cause of action of the third amended complaint adequately alleged actual constructive or implied fraud within the concepts expressed in *Boyd* v. *Bevilacqua, supra,* 247 Cal.App.2d 272, wherein the court said (pp. 288, 290): "While therefore it is the general rule that, as in the case of partners, a joint adventurer may not sue his co-adventurer in an action at law in respect to the joint venture until an accounting has been had, such rule does not apply where the wrongful act or acts complained of are not only a breach of contract but constituted a tort and particularly where the tort is of such a nature that it terminates the joint venture, wrongfully destroys it and results in the conversion by the coadventurer of the entire assets to his own use. . . . Constructive fraud frequently consists in the breach of a duty arising out of a confidential or fiduciary relationship. [Citations.] As we have said, where as here, there is an agreement of joint venture the parties assumed the status of fiduciaries and neither one had the right, while the joint venture existed, to acquire the property to the exclusion of the others. [Citations.] Indeed, during the existence of such fiduciary

---

[16]See footnote 15, *ante.*

relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining the advantage to show fairness and good faith in all respects. [Citations.]"

Appellants argue that the court erroneously instructed the jury that under the terms of the joint venture agreement, the joint venture was to be vested with title to the 2,600-acre parcel and the court preempted the jury's function. We do not agree. The questioned instructions were either jointly requested or predicated on an "if"—if the jury found a joint venture to exist.

Appellants complain that the questioned instructions were contrary to the plaintiffs' pleadings. The claim is contrary to the record. Paragraph XVI of plaintiffs' first cause of action alleged that under the joint venture agreement the parties agreed that "said real property would be purchased and developed for and on behalf of the joint venture and defendants would not purchase said property except for the joint and mutual benefit of the joint venture." The questioned instructions did not assume facts contrary to plaintiffs' pleadings.

Appellants argue that the court's erroneous assumption of a tort permeated the entire trial and resulted in the giving of erroneous instructions on discretionary interests, punitive damages,[17] and unanticipated damages.

The record of arguments in chambers demonstrates that plaintiffs attempted to proceed in the court below on the theory that they were entitled to the fair market value of the 2,600 acre parcel at the time of the repudiation of the joint venture by the defendants. The trial court did not agree[18] and ruled in accordance with defendants' contention that plaintiffs were only entitled to recover the "loss of profits," i.e., that which would have been recovered by plaintiffs if the joint venture had been consummated and not repudiated by defendants. The court quoted from *Nelson* v. *Reisner* (1958) 51 Cal.2d 161, 171-172 [331 P.2d 17] (which quoted from *James* v. *Herbert, supra,* p. 749): " 'Damages consisting of the loss of anticipated profits need not be established with

[17]We are no longer concerned with the question of the right of plaintiffs to punitive damages since the jury refused to award any.

[18]In our view this may well have been error in appellants' favor because under *Wilson* v. *Brown, supra,* plaintiffs could have sued for damages for conversion, but plaintiffs did not appeal from the judgment.

certainty. It is sufficient that it be shown as a reasonable probability that the profits would have been earned except for the breach of contract.' "

The trial court said (in discussions in chambers) "I think that what it really means is, in the light of this *James* v. *Herbert* rule, that the jury is able to find, from the evidence, that there is evidence from which they could find a reasonable probability that the property could have been sold at a profit." The record is clear that although the trial court permitted proof of fair market value *as a starting point for the determination of what profits, if any, would have been realized,* the court did not (contrary to appellants' claims) treat the question of damages as in a condemnation case.

Appellants also complain that the court did not give the jury instructions defining "conversion." ■■■ The court did give jury instructions on breach of fiduciary duty, which is what defendants were technically guilty of and the court did correctly instruct the jury that for a breach of such duty by a joint venturer, "the measure of damage is the amount which will compensate for all of the damage proximately caused thereby whether it could have been anticipated or not." (Civ. Code, § 3333.) The instruction was a correct statement of law.

Appellants complain that because of the court's misconception of the theory of the case and therefore the correct measure of damage the jury was erroneously instructed on damages in other respects. ■■■ Appellants contend that plaintiffs' recovery must be limited to compensatory damage and the court was guilty of error in trying the case as a tort action, but allowing recovery of damage as in an action in eminent domain. Appellants arrive at this conclusion because the trial court allowed plaintiffs to produce expert witnesses to establish the fair market value of the property at the time of repudiation. This strawman argument disregards the very obvious fact that it would have been legally and factually impossible to determine the "amount which will compensate for all of the damage proximately caused" by the defendants' wrongful conduct in repudiating the joint venture agreement excluding plaintiffs from the joint venture and appropriating the joint venture property to the defendants' use and benefit, without first determining the value of the property and the price at which the joint venture property could have been sold. That determination was the starting point for the ultimate conclusion of the amount of damage. If the real property could only be sold at a loss then obviously plaintiffs would have sustained no damage. The court merely instructed the jury that it could consider the

fair market value of the property in determining what, if any, damage plaintiffs suffered by the defendants' repudiation. Defendants themselves requested a similar instruction.[19]

 Appellants complain that the court instructed the jury that the measure of damage was "The share to which plaintiffs were entitled of the profits, if any, which the joint venture could reasonably have been expected to earn during the period of the joint venture *computed in accordance with the agreement of the parties.*" (Italics ours.) The instruction was a correct statement of law regarding the measure of damage.

Since the 2,600-acre parcel had not been sold, the jury, in order to compute the amount of damage sustained by plaintiffs, was, of necessity, required to make assumptions regarding the manner in which the property could be marketed (whether in large parcels or individual subdivision lots, or both), the time required to market the property, the costs of marketing and other proper joint venture expenses. The jury, therefore, was properly instructed that if it found that a joint venture existed and that plaintiffs were entitled to recover damages, then the jury was to determine the proceeds which it found the joint venture could reasonably have been expected to receive from a sale or sales of the property during the period of the joint venture *in accordance with the agreement of the parties.* The jury was instructed to make "deductions from the proceeds . . . the joint venture could reasonably have been expected to receive from a sale or sales of the property during the period

[19]"During the trial, testimony has been presented concerning the fair market value of the real property in the vicinity of Big Bear Lake which was purchased by the Defendants in January of 1969. In the course of your deliberations, if any, on the issue of damages based upon loss of anticipated profits, the fair market value of such property may be considered by you as some evidence tending to establish the amount which a purchaser might be willing to pay for such property. That is to say, it is some evidence of the price which could be received if there were a market for the property and if it were sold. It does not, however, constitute evidence that such a market actually existed, that ready, willing and able buyers were available or that the property, with reasonable certainty, would have been sold at that price, and you may not so consider it. These factors must be established by other, independent evidence in addition to the evidence of fair market value. [¶] If you have occasion to consider or determine the fair market value of the property in question, you are instructed that you must fix and determine such fair market value of the property as a whole, or as one entire parcel or package in one transaction. Furthermore, such value must be fixed and established as at May-June, 1969. Such determination may not be determined or based upon the assumption that the entire property had been subdivided or broken up and then sold in separate or smaller parcels."

In closing argument to the jury, defense counsel argued "[T]he fair market value evidence that you received is something that you are going to be entitled to consider on this issue of whether or not it was reasonably probable that a sale could take place."

of the joint venture. [¶] . . . [including] payment of the costs and expenses of the venture including the costs of such sale or sales" and defendants' advances for the purchase of the property and Colburn's 20 percent after taxes.[20] At the joint request of the parties, the jury was instructed that it could not award speculative damages and that it could only award damages if it was shown "as a reasonable probability that the profits would have been earned except for the breach." The various possible alternatives for computing damages were fully argued by both sides. Counsel fully argued the possible terms of sale—cash or terms. Contrary to the contention of appellants, the jury was not instructed to equate the fair market value in May of 1969 with expected gross revenues. It was merely instructed to consider the fair market value of the 2,600-acre parcel, the price at which the property could reasonably have been expected to be sold, as a factor to consider in determining the reasonable probability that profits would have been earned but for the breach.

■ Appellants complain that the jury was not adequately instructed on how to compute Colburn's right to 20 percent after taxes and that there was a failure of proof regarding the various factors which went into such formula. There was no failure of proof. There was substantial evidence that the taxes referred to were capital gains taxes at a 25 percent (or 28.3 percent) rate. Gherman testified that Colburn explained to him in substance that he would get 20 percent per annum after capital gains tax. John Arme, a tax consultant, called by defendants, testified to all of the corporate tax rates for ordinary and capital gains income for the years 1969 through 1978. He testified that the corporate capital gains rate for 1969 was 30.8 percent consisting of the basic federal rate of 25 percent, the temporary federal surtax rate of 2.5 percent and the California corporate rate of 7 percent minus the 3.7 percent federal tax benefit accruing from the deductibility of the California tax. Charts were received in evidence. Defendants requested no instructions on the

---

[20]The entire instruction read: "In calculating such profits, you should make the following deductions from the proceeds which you find the joint venture could reasonably have been expected to receive from a sale or sales of the property during the period of the joint venture. [¶] First, payment of the costs and expenses of the venture including the costs of such sale or sales. [¶] Next, payment to defendants of all sums advanced by them to the venture in respect to the cost of purchase or acquisition of the property. [¶] Next, payment to defendants of a sum equal to 20 percent per annum net after taxes on their outstanding investment, computed in accordance with the understanding and agreement of the parties. In determining what their understanding and agreement was as to this computation, you may consider all of the surrounding [sic] facts and circumstances, including their acts and declarations, upon which you base your finding as to the existence of a joint venture. [¶] Next, 50% of the balance, if any, would constitute the measure of damages plaintiffs would be entitled to recover from defendants."

subject. The jury was told twice—once in defining the issues and at least once in defining damages that in computing damages they would have to deduct from the proceeds which the jury found that the joint venture was reasonably certain to receive from the sale of the property "a sum equal to 20 percent per annum net after taxes on their outstanding investment, computed in accordance with the understanding and agreement of the parties." In the absence of a request for more specific instructions either from the defendants or the jury, we assume that the jury understood the instruction and complied therewith.[21] There is nothing in the record to indicate that the jury did not thereby receive adequate instructions and that they were not able to make the proper computations in accordance with the evidence produced. Appellants' assumptions to the contrary are precisely that—assumptions having no basis in the record. Appellants have the burden of demonstrating error. We do not presume lack of capacity by the jury. In the face of the evidence produced regarding capital gains rates, the court had no right or duty to instruct the jury to use ordinary income tax rates as appellants now contend. Such an instruction would not have been supported by any evidence in the record. Appellants' contention that under the federal tax law they were taxable at ordinary tax rates, not capital gains rates is a recently developed concept conceived by post-trial research. The record contains substantial evidence that by their agreement the parties agreed that in computing Colburn's share of 20 percent "after taxes" the parties referred to capital gains taxes, not taxes on ordinary income. Since the jury impliedly found that that was the agreement of the parties it would be immaterial whether or not Colburn would have been subject to ordinary income taxes as a matter of federal law.

[21]As we have already noted, the parties by their jointly requested instruction regarding the issues which the jury was requested to resolve (*ante,* p. 556) mutually agreed that the plaintiffs had the burden of proving that one of the terms of the alleged joint venture agreement was that the parties agreed to deduct from gross receipts from the sale of the 2,600 acres and pay to defendants "a sum equal to 20 percent per annum net *after taxes* on their outstanding investment." The jointly requested instruction did not specify the type of taxes referred to—whether the term "taxes" referred to ordinary income taxes or capital gains taxes. Gherman testified that the term "taxes" referred to capital gains taxes—Colburn said "[H]e would get 20 percent after capital gains taxes" which was computed at a tax rate of 28.6 percent. Patterson corroborated the testimony of Gherman. In fact that was the reason the parties agreed to take title in the name of a Colburn corporation in order to enable the corporation to take advantage of the capital gains rate, and defense counsel so argued to the jury. Although Colburn testified at least twice that he was a "little uneasy" and that there were "risks" involved in the situation [insofar as being entitled to capital gains taxes under federal law were concerned], we do not find in this record any testimony by Colburn that the parties "*agreed*" that the term "taxes" meant income taxes or any kind of tax except capital gains tax. This is not surprising since it was Colburn's contention that the parties never "agreed" to anything—all they did was talk and negotiate. However, Colburn did testify "I had

Appellants argue that the jury was not properly instructed about the time factor in determining the fair market value of the property (in order to compute gross profits from sales) and the time factor in determining costs and expenses which the joint venture would incur (such as overhead, office expenses, taxes, etc.) pending such sale or sales. We do not agree. The jury was instructed that if they found that a joint venture existed and had been repudiated, then they were to find what, if any proceeds the joint venture "could reasonably have been expected to receive from a sale or sales of the property *during the period of the joint venture*" and that "[i]n calculating such profits" they should make designated deductions in accordance with the alleged agreement of the parties. (Italics ours.) There is no basis whatsoever for assuming (as appellants do) that the jury computed gross income as of one time frame and deductions as of another time frame. Appellants are conjuring up nonexistent bogeymen.

always contemplated that Concord would realize a capital gain" and that the way the lawyer drew certain documents (which would have provided that Concord loan money to the joint venture to enable the joint venture to purchase the property) would have deprived Concord of the capital gain which was always contemplated. The jury was entitled to draw inferences from this testimony which would be favorable to plaintiffs' position that the taxes the parties referred to would be capital gains taxes, not ordinary income taxes. In the light of this record, therefore, there was no factual basis for the court to instruct the jury that the tax rates which the jury should apply were ordinary income tax rates rather than capital gains tax rates. The only evidence of what was "agreed" to was presented on behalf of plaintiffs. Such evidence was found by the jury to be true or untrue. A finding that it was untrue would not provide evidentiary basis for an agreement that the tax referred to was ordinary income tax. The jury impliedly found that the evidence was true. Furthermore, even if there had been such an evidentiary basis in the record, such an instruction would have usurped the jury's function to resolve a conflict in the evidence and to determine *as a fact* which tax rate the parties intended by their agreement.

At defendants' request the court gave the jury the following instructions: [1] "There can be no agreement unless the minds of the parties have met and have agreed on the essential terms thereof." [2] "Agreements must be definite enough so that the trier of facts can ascertain what is required of the respective parties and whether their respective obligations have been performed or breached." [3] "If conversations and negotiations between parties constitute merely an agreement to agree in the future or leave any essential element of the arrangements, plans or relationship to be determined in the future, then there is no agreement."

At the joint request of plaintiffs and defendants, the court instructed the jury: "If an essential element of a promise is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement is made. But unessential matters need not be agreed upon, or may be left to future determination."

In the absence of some basis for concluding otherwise, we presume that the jury followed the court's instructions and that the jury found that the parties had mutually agreed on the meaning of the term "20 percent after taxes" and that the jury impliedly found that the taxes referred to meant capital gain taxes. If that was the agreement of the parties as the jury impliedly found, an instruction on ordinary income taxes would have been irrelevant. Furthermore, we have not been able to find in this record that defendants requested any instruction on income taxes or any other taxes which the trial court refused to give. (Italics ours.)

Appellants also complain that the jury was given no instruction on the present value of money. The argument assumes that the jury's award was for future damages. There is no basis for such assumption. The evidence was that all parties intended and contemplated that the property would be sold at the earliest practicable date (in order to minimize Colburn's 20 percent per annum factor) and that the time required to effectuate such sale or sales was variously estimated at between one and five years. In view of the fact that the case went to trial in the court below four years and six months after defendants' repudiation of the joint venture agreement, there is no basis for assuming that the jury in making its award made an award for future damages or that it needed an instruction on the present value of a money award. Defendants did not think that the jury needed any such instruction in the trial court for they requested no such instruction. The contention is clearly a post-trial afterthought.

Appellants also complain that the jury awarded speculative damages. The jurors were specifically instructed in a *jointly* requested instruction that they could not do so. We presume that they did their duty and complied with the instruction.

It would unduly prolong this opinion to further discuss in detail each of appellants' additional contentions regarding alleged erroneous instructions on the measure of damages. Suffice it to say that we have considered each of the contentions and conclude that they are devoid of merit.

### 3. Did the court err in rulings on evidence?

### a. Exclusion of Himes' feasibility study

Plaintiffs produced Earl R. Metcalfe, a qualified real estate appraiser, as a witness who testified that in his opinion the fair market value of the entire 2,600-acre parcel of real property as of May 1969 (the date of defendants' repudiation of the joint venture) was $11,296,850.[22] To refute this evidence, defendants produced James R. Himes, a qualified real estate appraiser who first testified that in his opinion the 2,600-acre parcel had a fair market value in May of 1969 of $4,100,000 and then testified that in his opinion (as a result of a "second study" or "non-residential subdivision study") the 2,600-acre parcel would produce

---

[22]Metcalfe recognized that from this figure selling costs and other deductions (such as Colburn's 20 percent after taxes) would have to be deducted in arriving at the profits which the joint venture could reasonably be expected to make in accordance with the terms of the joint venture agreement.

"total gross sales" as of May 1969 of $6,536,490 from which deductions or adjustments would have to be made. However, the figure of $6,536,490 was merely a mathematical computation of the figures to which Himes previously testified as constituting the fair market value of 25 parcels aggregating 2,600 acres. Counsel for appellants admitted that Himes had no "business putting gross sales figures up there" when the figure was a computation of a series of figures on fair market value. Appellants' counsel conceded "I think that is probably true." (I.e., that Himes should not have characterized the figure as "gross sales.") The jury then inspected the 2,600-acre parcel at Big Bear Lake. When trial resumed Himes explained that the reason for his second feasibility study was that there is a relationship between an opinion of highest and best use and an opinion of market value, that the purpose of his feasibility study was to "measure that relationship. Primarily being a test . . . of highest and best use." Counsel for plaintiffs objected that the witness had testified that the figures from which the computation had been made had been presented as figures on fair market value. Himes was then examined outside the presence of the jury. Himes explained that the "entire purpose [of the feasibility study] is not for valuation but for highest and best use." The court ruled that in its opinion plaintiffs were not entitled to recover fair market value as of the date of repudiation but only damages, that "[T]he fair market value is evidence for the jury to consider in determining damages," that in any event the expert "has a right to express an opinion" but that it was a confusion in terms to testify that property had a certain "fair market value and then to start taking deductions from that fair market value. Plaintiffs' counsel conceded that the appraiser was entitled to deduct sales costs and other expenses but that he should not be permitted to deduct profits. Defense counsel explained that the feasibility study was to merely confirm the witness' opinion of highest and best use. Defense counsel argued that he was entitled to prove values in accordance with principles applicable to condemnation cases. The court concluded that in effect all Himes was testifying to was that the fair market value was $4,100,000[23] and that he was entitled to give his reasons for arriving at that opinion, but he was not entitled to testify to fair market value ($6,536,490) and then deduct a profit factor from that figure in order to arrive at fair market value as of

[23]Himes had formed his opinion that the 2,600-acre parcel had a fair market value of $4,100,000 by considering the sale from Big Bear Development Co. to Big Bear Properties (i.e., the sale to the Gherman/Colburn joint venture) as a comparable sale disregarding completely the fact that the purchasers paid that price in the reasonable expectation of making a profit. Obviously, based on the Himes' assumption, there could be no profit from the purchase and sale of the 2,600-acre parcel and plaintiffs would have sustained no damage from the repudiation of the joint venture.

May 1969. The court sustained plaintiffs' objection. When the jury trial resumed, Himes testified that in his opinion the fair market value of the 2,600-acre parcel, as of May 1969, sold as a single unit was $4,100,000, but that if it was broken up and sold in smaller parcels over a period of time the fair market value as of May 1969 would be $6,536,490, and that it would take three to five years to market the property if it was sold in the smaller parcels.

■ In our view the court did not improperly restrict the testimony of Himes. The joint venture acquired the property initially in order to make a profit from the resale of it. If the resale of the property in smaller parcels over a period of time would produce a profit to the seller, then the joint venture would be entitled to that profit and that profit should not be deducted in computing fair market value as of the date of repudiation. The Himes' feasibility study was to that extent based on an improper legal premise and would only contribute confusion in the minds of the jurors. Incompetent reasons or evidence may not be elicited as the basis for the opinion of an expert (Evid. Code, §§ 801, 802; *Furtado* v. *Montebello Unified Sch. Dist.* (1962) 206 Cal.App.2d 72, 79 [23 Cal.Rptr. 476]). Where the opinion is based on considerations that are partially proper and partially improper, the trial court has discretion to admit or exclude such evidence. (*San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889, 902 [63 Cal.Rptr. 640].)

### b. Exclusion of evidence regarding losses sustained by Big Bear Properties, Inc.

Defendants called John C. Arme, a certified public accountant, employed by Colburn, who testified that he had inspected and audited the books and records of Big Bear Properties, Inc., and that "It has had a deficit." Arme was then asked if he knew "what that deficit is as of say September 30, 1973?" To which question plaintiffs objected on the ground that it was immaterial. Defense counsel explained that it was material because plaintiffs were seeking punitive damages against Big Bear Properties, Inc., and its financial condition was relevant to that issue,[24] but more importantly because defendants had attempted to file a cross-complaint and "We didn't feel that we could arrive at a solution in this case if a joint venture were found to exist without an accounting,"

---

[24]Plaintiffs withdrew their request for punitive damages against all defendants except Colburn. As already noted, the jury fixed punitive damages against Colburn at zero dollars. This basis for admissibility is no longer valid.

that the court in denying leave to file a cross-complaint had indicated "[T]hat this may very well be appropriate in the damage area" and therefore defendants wanted to show that the property had not, in fact, been sold. Defense counsel stated "I want to show the net negative position of the company. It's had a lot of expenses." Counsel argued that if the expenses were not proper charges, "Mr. Ball, on cross examination, can go into them." Defense counsel then indicated that all he intended to do was to "ask him a figure as of the latest date we have, which is September 30, 1973, and then pass on." Counsel then offered to prove that the (deficit) "figure" was $2,800,000. It then developed that Big Bear Properties, Inc., had purchased a second parcel of property at a cost of $277,515. In support of the motion for leave to file a cross-complaint defense counsel had previously filed an affidavit in which the court was advised that Big Bear Properties, Inc., had sustained a deficit of $2,602,000 through July 31, 1973, which consisted of interest paid, real property taxes, legal and accounting fees and operating expenses. Counsel (Morton B. Jackson) had testified that his firm had collected $285,746 from the corporation in legal fees (which were apparently primarily in the defense of the present action).

We conclude that the ruling sustaining objection to the offer to prove that Big Bear Properties, Inc., had sustained an operating deficit as of September, 1973, of $2,800,000 was not prejudicial error. Such deficit was not evidence of what profits the joint venture might have been reasonably expected to earn at the time of repudiation in May 1969. The joint venture was not chargeable with the cost of or losses sustained in the purchase of the second parcel of property, which even plaintiffs do not claim was within the scope of the joint venture. Likewise the joint venture would not have been chargeable with attorneys' fees in defense of this action. The vice of the offer was that there was no foundational showing that the deficit consisted of losses which the joint venture would have sustained in the normal course of operation if defendants had not repudiated the joint venture.[25] When the admissibility of evidence requires a preliminary foundation, that requirement is not satisfied merely by offering to allow an opposing party to demonstrate by cross-examination that the required foundation does not exist, which is precisely what defense counsel attempted to do in this case.

---

[25]There is authority for the proposition that the right of a partner to an accounting and reimbursement for expenses and losses applies only to "honest and faithful members of a copartnership" not to those who dishonestly repudiate the existence of a partnership. (See *Freeman* v. *Donohoe* (1923) 65 Cal.App. 65, 89 [223 P. 431].)

Although the offered evidence might have had some bearing on the issue of net worth as the basis of an award of punitive damages, the ruling was nonprejudicial on that ground since the jury made no award of punitive damages.

### c. Admission of evidence for limited purposes.

At the outset of trial, plaintiffs offered oral testimony and documentary evidence of studies and calculations which they had made regarding the possible marketing of the property, and the actual efforts which they had made regarding the marketing of the property for the limited purpose of establishing the existence of a joint venture. At the request of defense counsel, the court carefully and repeatedly instructed the jury that the evidence was received "with respect to the issue of whether or not plaintiffs and defendants entered into a joint venture" adding: "It is not being offered and shall not be considered by you on the issue of whether or not the statistics and the data in the exhibit are accurate." Thereafter the same instruction was repeated. Other evidence was received in evidence "subject to the same instruction." The record discloses that at the close of the afternoon session, the following occurred: "THE COURT: Would this be a good point to take the evening recess? [¶] MR. CROSKEY: I wonder, before we close, if it would be appropriate to request that the same limiting instructions should apply to the detailed testimony. [¶] THE COURT: I have already told the jury the instructions apply to the exhibits—[¶] MR. CROSKEY: As well as the testimony. [¶] THE COURT: —of 9 through 16. [¶] Mr. Croskey: Of the testimony. [¶] MR. BALL: That's right. [¶] THE COURT: Ladies and gentlemen, we will take a recess until 9:30 tomorrow morning."

■ Appellants now complain that the jury was not adequately instructed on the limited purpose for which the evidence was offered. In our view the correct answer is that (if the limiting instructions were insufficient) the request for a limiting or more specific limiting instruction should have been made as the evidence was offered, rather than waiting for the close of the court session when a certain state of confusion existed regarding adjournment. The record demonstrates that the court gave a limiting instruction when properly requested to do so. At the conclusion of the case the jury was instructed that evidence received for a limited purpose could be considered as evidence only on that limited issue.

Appellants make the same contention regarding plaintiffs' evidence of *their efforts to sell the property to prospective purchasers for the limited* purpose of establishing the existence of a joint venture which is equally devoid of merit. However, appellants add the additional argument that such evidence should have been excluded entirely under Evidence Code section 352.[26] At trial defendants agreed that such evidence was relevant. The court gave limiting instructions. The contention that the evidence should have been excluded in the court's discretion under Evidence Code section 352 is clearly raised for the first time on appeal. The *sine qua non* for invoking the protection of Evidence Code section 352 is a request at the trial level that the court exercise its discretion. *Prichard* v. *Veterans Cab Co.* (1965) 63 Cal.2d 727, 734 [47 Cal.Rptr. 904, 408 P.2d 360]; *Laursen* v. *Tidewater Assoc. Oil Co.* (1954) 123 Cal.App.2d 813, 817-818 [268 P.2d 104].) The objection cannot be raised for the first time on appeal. (*People* v. *Maxey* (1972) 28 Cal.App.3d 190, 196 [104 Cal.Rptr. 466].) That is not to say that the court cannot exclude improper evidence on its own motion. (Evid. Code, § 765.) When appropriate, the court has the same power to act on its own initiative without waiting for an objection. (*Fortner* v. *Bruhn* (1963) 217 Cal.App.2d 184, 190, 191 [31 Cal.Rptr. 503]; *Dastagir* v. *Dastagir* (1952) 109 Cal.App.2d 809 [241 P.2d 656]; *People* v. *Durrant* (1897) 116 Cal. 179, 212 [48 P. 75].)

### d. Cross-examination of Gherman.

Appellants complain that their cross-examination of Gherman was unduly restricted in two respects: (1) regarding loans previously made by Colburn to Laurie Lane and, (2) regarding Gherman's understanding of what Colburn "had in mind" with respect to the functions of Colburn's brother, Price, and Colburn's certified public accountant, Fitzgerald.

The precise question regarding the abortive loan transaction in 1967 was "Q. What happened on that trip to that bank?" An offer of proof at bench indicates that the defense wanted to show the witness a document that related to the transaction in 1967 (having no relation to the transaction in the case at bar) in which the parties "were going to handle the financing which resembles a joint venture." Apparently the contention was that because the parties contemplated a written agreement in

---

[26] Evidence Code section 352 reads: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue .consumption of time or (b) create substantial danger of undue prejudice. of confusing the issues, or of misleading the jury."

connection with a prior transaction which was never consummated that that fact was somehow probative of whether or not the parties would have entered into an oral joint venture arrangement in the transaction involved in the case at bar.[27]

■ In view of Colburn's testimony that he instructed his lawyer Jackson to draw a written agreement, which Jackson did, in the form of a memorial of an existing oral joint venture,[28] we conclude that the evidence regarding the prior loan transaction between Colburn and Gherman and Laurie Lane was irrelevant, remote, collateral and speculative. Its exclusion under the provisions of Evidence Code section 352 did not constitute an abuse of judicial discretion or prejudicial error. The court invoked Evidence Code section 352 on its own initiative as it had the right and power to do. (See discussion and authorities, *supra,* under heading 3. d.)

■ Clearly the court was correct in sustaining plaintiffs' objections to defense questions propounded to Gherman regarding his understanding of "What Colburn had in mind." Such testimony by Gherman would have constituted speculation regarding the state of mind of another person, and such speculation would have been both incompetent and irrelevant. Plaintiffs' counsel indicated that he would have no objection if the defense examined on the question of what, if any, words were spoken by Colburn and such examination was conducted.

A witness may not speculate regarding the state of mind of another person absent proper evidence of such state of mind such as declarations or conduct. The ruling did not constitute prejudicial error.

### e. Defendants' direct examination of Jackson.

Appellants contend that the court improperly restricted their direct examination of their witness Jackson, who was Colburn's business lawyer, regarding his drafting of the joint venture agreement. Jackson was permitted to testify fully to all conversations with Gherman and all

---

[27]In the case at bar, the evidence established that Colburn instructed his lawyer Jackson to draw written instruments which Jackson did couched in the form of a memorandum or memorial of an existing oral joint venture. (Exhs. 28, 29.) Gherman made changes in the drafts prepared by Jackson, which Colburn approved, instructing Jackson to redraft the documents. Colburn admitted that he authorized Jackson to draw the draft agreement.

[28]Jackson had been a percipient witness to many of the negotiations and dealings of the parties and was well aware of the details, legal form and status of the joint venture.

instructions and directions which he had received from Colburn regarding the drafting of the agreement[29] and everything that he had been a percipient witness to in the negotiations and relations between the principals. Jackson had inserted Concord Investment Co. (a company owned and controlled by Colburn) as the "first party" in the agreement. Defense counsel asked Jackson if there was any particular reason why he had used Concord as the first party in view of the fact that Jackson then knew that Concord was no longer in existence. The court sustained plaintiffs' objection that the question called for an answer which would be irrelevant. Jackson had previously testified that it was his own idea "purely his own invention" to use Concord as the first party. After argument at bench, the court ruled that "merely because he's a lawyer doesn't permit him to interpret his own agreement and get into his mental processes." The court said: "I don't think he can say why he put that in. That is very self serving. It's his conclusion—" The objection was sustained.

A witness may competently testify to his own state of mind when the witness' state of mind is relevant to any issue in the case. (*Walton* v. *Bank of California* (1963) 218 Cal.App.2d 527, 544 [32 Cal.Rptr. 856].) However, Jackson's state of mind was not relevant to any issue in the case. Jackson testified that he did not receive instruction on the subject from Colburn. "Why" he used Concord as first party would, therefore, be irrelevant. The court's ruling, therefore, was correct (in the absence of an offer of proof showing the relevancy of the information), although the reasons given by the court for its ruling may have been incorrect. Jackson was permitted to fully testify and produce all evidence which was competent and relevant. Since he was not a principal, his own mental processes were irrelevant.

Appellants complain that they were prejudiced by the trial court's improper "control" of the evidence which was "unwarranted." We have examined each claim of error on its merits and find that the trial court's rulings on specific objections or offers of evidence were legally correct. There is a well established principle of logic that the whole is the sum total of its parts. If the individual rulings were legally correct (as we conclude) then it must logically follow that the court did not exercise improper "control" of the evidence which was "unwarranted."

f. Defense examination of Gherman concerning tract 7904.

---

[29]Actually there were two drafts which were substantially identical. (Exhs. 28, 29.)

Appellants contend that their cross-examination of Gherman regarding his alleged mismanagement of tract 7904 during the years 1968-1971 was unduly restricted by the trial court under Evidence Code section 352. They now contend that such cross-examination was proper for a variety of reasons. We are required to rule on the record as it existed at trial. The basic problem arose at trial when defense counsel was examining Gherman regarding his projections submitted to Colburn regarding the profits which would be made from the sale of the 2,600 acres.[30] The record is as follows: "Q. Now, it has been your experience, has it not, that things can go wrong with projections? [¶] A. I would have to assume that anything could go wrong with anything, Mr. Croskey. [¶] Q. Well, again, the tight money market can affect sales, can it not? [¶] A. Yes, sir. [¶] Q. It can slow your sales pace? [¶] A. Yes, sir. [¶] Q. In fact, didn't you experience that very thing in the sales experience you had in Tract 7904—[¶] MR. BALL: That's objected to. [¶] MR. CROSKEY: —beginning in 1969? [¶] MR. BALL: That's objected to as immaterial. [¶] MR. CROSKEY: I would like to be heard on that. [¶] THE COURT: The objection will be sustained. [¶] MR. CROSKEY: May I approach the bench."

After argument at bench counsel was instructed to make an offer of proof after the recess which counsel did. In essence counsel offered to prove that because of the incompetence and mismanagement of Gherman in connection with tract 7904, he lost money on tract 7904. The court ruled that such evidence might be admissible on the issue of damages "but at this stage of the case I think you are way off, *you are premature on that,* and under [Evid. Code] 352 it would I think confuse the jury and be prejudicial and raise issues that really shouldn't be gone into with respect to the jury in this case. It would take a lot of time to get into all that other tract and that's really not the issue that we are concerned with *at this point.*" (Italics ours.) " 'Was there a joint venture, and did he perform?' That's all *at this point* that the evidence [of projections] is offered for." (Italics ours.)

■ It is elemental that the trial court has power to control the order of proof and its rulings will not be disturbed on appeal unless there is an abuse of discretion. (Evid. Code, § 320; *Jacobson v. Lamb* (1928) 91 Cal.App. 405, 417 [267 P. 114]; *People v. Enos* (1973) 34 Cal.App.3d 25, 41 [109 Cal.Rptr. 876].)

---

[30] It should be borne in mind that at that point the projections had been received in evidence for the limited purpose of proving the existence of a joint venture agreement.

Defense counsel returned to the same subject at a later stage of the trial, and made an extensive offer of proof which in ultimate effect would have established that in connection with tract 7904 by September 1971, the enterprise lost $543,000 because of Gherman's alleged incompetence and mismanagement. Counsel stated that the reasons for the production of evidence was to establish Gherman's "experience and expertise" and consequently "[T]here was no consideration for whatever agreement might be found to exist. . . . [¶] It also goes to the issue of motive. . . . [¶] These facts would be probative of Mr. Colburn's awareness thereof of the fact that he had no motive to cheat or defraud Dr. Gherman but in fact realized the man didn't know what he was doing and he darn well could no longer be free to do business with him, . . . [¶] And, finally, to the damage issue, to the extent that projections of Gherman and Patterson are involved, I think this is probative of the fact that their projections weren't worth very much, . . ."[31]

Counsel stated: "For all of those reasons, your Honor, we would feel that the evidence is relevant, and I appreciate that it presents a time burden to the court, but I don't think it is so remote or collateral to the issues in this case as to be denied admissibility."

The court sustained plaintiffs' objection under Evidence Code section 352 stating: "Well, I think we are trying to get, really, into the trial of another lawsuit—. . . . but it's not here in this trial."

We conclude that the trial court ruling under Evidence Code section 352 did not constitute an abuse of discretion.

The fact that Gherman lost $543,000 on tract 7904 as of September 1, 1971, could not be relied on by Colburn to justify repudiation of the joint venture agreement in May 1969. The record indicates that Gherman didn't even begin to sell lots in tract 7904 until March 1969, about 60 days prior to Colburn's repudiation of the joint venture. What ultimately happened in September 1971, could not provide motive for what Colburn did in May 1969, or establish lack of consideration for the joint venture agreement in May 1969. A defendant may not justify a repudiation by proof of subsequent failure of consideration which was unknown at the time of the repudiation because the fact that consideration subsequently diminishes in value will not relieve a promisor from

---

[31]The Gherman/Patterson "projections" were never received in evidence as evidence of damage or on any other issue except to establish the existence of a joint venture. Plaintiffs proved damage by the testimony of Metcalfe and other evidence.

his promise. (*Riverside Water Co.* v. *Jurupa Ditch Co.* (1960) 187 Cal.App.2d 538, 542 [9 Cal.Rptr. 742].)

The evidence was offered on the damage issue "only to the extent that the projections of Gherman and Patterson are involved." Since the Gherman/Patterson projections were offered only to establish the fact of a joint venture and not to prove damages, the evidence was irrelevant "as probative of the fact that those projections weren't worth very much." Evidence regarding Gherman's management of tract 7904 was clearly collateral and the court was required to weigh the probative value of the evidence against the trial time that would be consumed by its production, which was estimated to be as long as two weeks' trial time.

Appellants now also seek to support and justify the offer of proof on grounds not stated in the trial court but raised for the first time on appeal. The contentions cannot now be raised for the first time on appeal. (*People* v. *Thomas* (1970) 3 Cal.App.3d 859, 864 [83 Cal.Rptr. 879]; *People* v. *Rodriquez* (1969) 274 Cal.App.2d 770, 777 [79 Cal.Rptr. 240].)

We conclude that appellants have not carried their burden of establishing here that the court's rulings excluding such evidence under Evidence Code section 352, which involved judicial discretion, was an abuse of that discretion. (*Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].) We find no prejudicial error.

Appellants argue that evidence of Gherman's alleged mismanagement of tract 7904 and that evidence that Big Bear Properties, Inc., sustained a deficit as of September 1, 1971, was admissible on the issue of the right of plaintiffs to recover interest. The court gave the jury an instruction (requested by plaintiffs) on when interest could be awarded in the following language (as mod.):[32] "In an action for breach of duty owed by a

---

[32]Interest is allowable under Civil Code section 3288 which reads: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

The jury was instructed (at defendants' request [the trial court's modifications appear in parentheses]) on when it could allow punitive damages as follows: "If you find that the Plaintiffs have suffered actual damages as a proximate result of the acts of the Defendants (Richard D. Colburn) on which you base your finding of liability, you may in your sole discretion award additional damages against the Defendants (Richard D. Colburn), known as punitive or exemplary damages, for sake of example and by way of punishing ~~the~~ (said) Defendants if, and only if, you find by a preponderance of the evidence that ~~the~~ (said) Defendants ~~have~~ (has) been guilty of actual malice. [¶] 'Malice' means a motive and willingness to vex, harass, annoy, or injure another person. Malice may be shown by direct evidence of declarations of hatred or ill-will or it may be inferred from acts and conduct, such as by showing that the Defendants' conduct was

joint venturer, and in every case of malice, interest on the amount of the award of the actual damages may be given, in the discretion of the jury. If you decide to award interest as aforesaid, it will be at the legal rate of 7% per annum from June 1, 1969. ~~the date you find the repudiation to have occurred.~~"

Since the jury refused to award punitive damages it is clear that the award of interest was based on an implied finding that there was a "breach of duty owed by a joint venturer" and that the jury impliedly found that there was no malice. Error, *if any,* in the exclusion of evidence offered to prove that Colburn's conduct was not motivated by malice would come within the doctrine of error cured by verdict. (*De La Torre* v. *Johnson* (1928) 203 Cal. 374 [264 P. 485]; *Julius Levin Co.* v. *Commercial Centre Realty Co.* (1923) 60 Cal.App. 718 [214 P. 248].) ▪ Adverse rulings of the court upon questions of the admissibility of evidence on issues ultimately found in favor of appellants are harmless. (*Harlan* v. *Ely* (1886) 68 Cal. 522, 527-528 [9 P. 947].) ▪ The law is clear that the jury may award interest even on an unliquidated sum against a joint venturer who has violated his fiduciary duties. (*Nordahl* v. *Department of Real Estate* (1975) 48 Cal.App.3d 657 [121 Cal.Rptr. 794]; *Redke* v. *Silvertrust* (1971) 6 Cal.3d 94, 106 [98 Cal.Rptr. 293, 490 P.2d 805].) Plaintiffs sought recovery on the basis of tortious conduct under theories enunciated in *Boyd* v. *Bevilacqua, supra,* 247 Cal.App.2d 272.

Evidence that Gherman allegedly mismanaged tract 7904 and evidence that Big Bear Properties, Inc., allegedly sustained a deficit were not relevant to the issue of whether or not Colburn violated his fiduciary duty and therefore such evidence was not relevant to the issue of whether or not plaintiffs were entitled to interest. Therefore the allegedly erroneous exclusion of such evidence had no bearing on the issue of whether or not plaintiffs were entitled to interest. As we have already noted, whether or not tract 7904 sustained a loss as of September 1971, would not be evidentiary of whether or not Colburn was justified in his repudiation of the joint venture in May of 1969.

We conclude that the exclusion of such evidence did not prejudicially affect the question of whether or not plaintiffs were entitled to interest.

wilful, intentional, and done in reckless disregard of its possible results. [¶] The law provides no fixed standard as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice.'"

4. Did the court err in refusing appellants' request for special interrogatories and in refusing to send instructions into the jury room?

Appellants complain that the trial court abused its discretion in denying their request that several special interrogatories (findings) be submitted to the jury, in refusing to send jury instructions into the jury room and hence the court did not exercise appropriate supervision over the verdict.

At time of trial herein, Code of Civil Procedure section 612.5[33] read: "Upon retiring for deliberation the jury may take with them a copy of the written instructions given."

Appellants cite 4 Witkin, California Procedure (1977 Supp.) Trial, section 247, page 103, as authority for the proposition that during the period that Code of Civil Procedure section 612.5 (as above worded during the period 1971 to 1974) was in effect it was enacted "to permit the jury to take a copy of the written instructions into the jury room as in criminal cases. . . . (See 1970 Cal. Law Rev. Com. Report, p. 1029; 33 Cal. S.B.J. 285.)"

Assuming, without deciding, that the statute was mandatory[34] during the period 1971-1974, it is manifest that no prejudice resulted. In the case at bar, the jury requested the rereading of instructions which the court reread, and there is no showing here that appellants were prejudiced in any way. Prejudice will not be presumed even where the case is complex.

Furthermore, reversal on this ground would serve no useful purpose since on retrial the court would unquestionably have the discretion (under the statute as now worded) which it has already exercised.

Defendants requested 20 special interrogatories, several of which had several subparts. Time and space do not permit a reproduction of all of

---

[33]Said code section was enacted by the 1971 Legislature: 1971 Statutes, chapter 1571, page 3150. By its express terms the statute remained in effect until December 31, 1974, at which time it was replaced by Code of Civil Procedure section 612.5 which now reads: "Upon retiring for deliberation the jury may, at the discretion of the court, take with them a copy of the written instructions given."

[34]It has been held that under Penal Code section 1137 the court has discretion in allowing the jury to take instructions into the jury room during deliberations. (*People* v. *Glass* (1968) 266 Cal.App.2d 222 [71 Cal.Rptr. 858], disapproved on other grounds in *People* v. *Superior Court (Kern County)* (1972) 6 Cal.3d 757 [100 Cal.Rptr. 281, 493 P.2d 1145].)

the special interrogatories. We set forth in the margin four of said special interrogatories[35] which illustrate our opinion that the requested interrogatories appear to resemble the techniques which would be used if the jury had returned a verdict in favor of plaintiffs and defendants were permitted to take the deposition of the jurors to demonstrate that there was some inconsistency in their subjective processes.

---

[35] "Special Interrogatory No. 17

"Please set forth the amounts of all state and federal taxes found by you to be payable with respect to all taxable income which would, with reasonably [*sic*] probability, have been earned by the venture.

*Year* *State* *Federal*
 $_____ $_____
[Thereafter identical spaces were provided for answers for nine more years.]

"Special Interrogatory No. 18
"a. Do you find that it is reasonably probable that the venture would have produced sufficient income to have reimbursed the defendants for all capital costs advanced by them to the venture?
 Yes:_____
 No: _____
"b. If your answer to Special Interrogatory No. 18a is yes, please set forth below the amounts of such reimbursement and the years in which they would have been made.
 Year:_____
 $ _____
[Thereafter identical spaces were provided for answers for eight more years.]

"Special Interrogatory No. 19
"a. Do you find that it is reasonably probable that sufficient monies would have remained out of the income (described in Special Interrogatory Nos. 10 and 11) to have paid the defendants an amount equal to twenty percent (20%) per annum on all unreimbursed capital costs advanced by them to the venture while such advances remained outstanding?
 Yes:_____
 No:_____
"b. If your answer to Special Interrogatory No. 19a is yes, please set forth below the amounts of all such payments and the years in which they would have been paid (or accrued) to the defendants.
 Year:_____
 $ _____
[Thereafter identical spaces were provided for nine more years.]

"Special Interrogatory No. 20

"a. Do you find that after the deduction of all items, if any, set forth by you if response to Special Interrogatory Nos. 12 through 19 from income which would have been earned by the venture, there would be anything remaining?
 Yes:_____
 No:_____
"b. If your answer to Special Interrogatory No. 20a is yes, please set forth the amount of such remainder and the year or years in which it would accrue.
 Year: _____
 $ _____
[Thereafter identical spaces were provided for answers for eight more years.]"

■ The trial court has discretion to determine whether or not to request the jury to return special findings in addition to a general verdict, and its decision will not be reversed except upon a showing of abuse of discretion. (Code Civ. Proc., § 625; *Ferro* v. *Citizens Nat. Trust & Sav. Bank* (1955) 44 Cal.2d 401 [282 P.2d 849]; *House Grain Co.* v. *Finerman & Sons* (1953) 116 Cal.App.2d 485, 498 [253 P.2d 1034]; *Lloyd* v. *Kleefisch* (1941) 48 Cal.App.2d 408 [120 P.2d 97]; *King* v. *Schumacher* (1939) 32 Cal.App.2d 172 [89 P.2d 466], cert. den., 308 U.S. 593 [84 L.Ed. 496, 60 S.Ct. 122]; *Mayfield* v. *Fidelity & Cas. Co. of New York* (1936) 16 Cal.App.2d 611 [61 P.2d 83]; *Hughes* v. *Quackenbush* (1934) 1 Cal.App.2d 349 [37 P.2d 99].) No abuse of discretion is shown here.

5. Allowance of interest.

■ Appellants contend that because of the provisions of Civil Code section 3358[36] the trial court erred in allowing the jury to award interest under Civil Code section 3288.[37] The contention is devoid of merit. In effect Civil Code section 3357[38] expressly provides that an award of damages under Civil Code section 3333 is exclusive of interest under Civil Code section 3288, since Civil Code sections 3333 and 3357 are in the same chapter (ch. 2 of tit. 2 of pt. 1.). Consequently, Civil Code section 3358 was not intended to exclude interest awardable under Civil Code section 3288. (See *Taylor* v. *Wright* (1945) 69 Cal.App.2d 371, 384-386 [159 P.2d 980].)

We have examined each of appellants' claims of error whether discussed in detail herein or not and have concluded that no prejudicial error has been shown which requires reversal of this judgment.

The judgment is affirmed.

Wood, P. J., and Hanson, J., concurred.

A petition for a rehearing was denied September 7, 1977, and appellants' petition for a hearing by the Supreme Court was denied October 20, 1977.

---

[36]Section 3358 reads: "Notwithstanding the provisions of this Chapter, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides, except in the cases specified in the Articles on Exemplary Damages and Penal Damages, and in Sections 3319, 3339 and 3340." (Fn. omitted.)

[37]Section 3288 reads: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

[38]Section 3357 reads: "The damages prescribed by this Chapter are exclusive of exemplary damages and interest, except where those are expressly mentioned."