Filed 11/24/14  Ramos v. Dillon CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JASMINE RAMOS et al., | D064589 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2010-00087010-CU-OR-CTL) |
| TERESA DILLON, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 31, 2014, be modified as follows:

The disposition paragraph is replaced with the following:

### "DISPOSITION

"The judgment is reversed and the matter remanded to the trial court for further proceedings to dissolve the partnership in accordance with the Corporations Code.  In the interests of justice, the parties are to bear their own costs of appeal."

There is no change in the judgment.

The petition for rehearing is denied.

McINTYRE, Acting P. J.

Copies to:  All parties

Filed 10/31/14  Ramos v. Dillon CA4/1 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JASMINE RAMOS et al., | D064589 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2010-00087010-CU-OR-CTL) |
| TERESA DILLON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Reversed and remanded.

Wicks Law, Coast Law Group and Rory R. Wicks for Defendant and Appellant.

Sharif | Faust Lawyers and Matthew J. Faust for Plaintiffs and Respondents.


Defendant Teresa Dillon appeals from a judgment in favor of Jasmine Ramos and David Ramos (together the Ramoses) arising out of a partnership between the parties to purchase and rehabilitate an apartment building.  Dillon argues the trial court erred by (1) failing to address and apply the material breach of contract affirmative defense, (2) awarding rescission of the partnership agreement and restitution of partnership

contributions, and (3) ordering dissolution of the partnership without complying with Corporations Code sections 16801 and 16807. (Undesignated statutory references are to the Corporations Code.) As we shall discuss, the trial court impliedly rejected Dillon's material breach of contract affirmative defense and substantial evidence supported this conclusion. However, the trial court erred when it ordered that Dillon pay the Ramoses their partnership contributions as damages and by ordering dissolution of the partnership without complying with the Corporations Code. Accordingly, the judgment must be reversed and the matter remanded to the trial court to determine the appropriate remedy.

## FACTUAL AND PROCEDURAL BACKGROUND

Dillon does not challenge the sufficiency of the evidence establishing the trial court's factual findings. Our recitation of the facts is derived primarily from a stipulation between the parties and trial court's findings as set forth in its March 28, 2012 interlocutory judgment and its June 19, 2013 amended judgment, which we shall refer to as the final judgment. Because the parties are well aware of the history of this dispute, we limit our recitation of the facts.

*The Interlocutory Judgment*

Dillon is a real estate broker who owns a realty company. Jasmine is a licensed real estate agent who worked for Dillon's company. Jasmine's husband, David, is also a licensed real estate agent with 25 years experience in the construction industry, but is not a licensed contractor. In April 2004, the Ramoses and Dillon entered into an oral partnership for the purposes of purchasing an apartment building located in San Diego, California (the Property).

2

Dillon and the Ramoses each contributed $250,000 toward purchasing the Property. The parties agreed to be equally responsible for expenses and costs related to the Property and equally share any profits generated by the Property. The parties agreed that David would perform repairs to the Property and receive $10,000 per month, in the form of compensation or credit, for performing repairs to the Property from 2007 to 2009. The Ramoses knew when they purchased the Property that it would require repair or refurbishment and that they would be obligated to pay one-half of these costs.

In November 2004, Dillon and Jasmine obtained a hard money loan in the amount of $300,000 to purchase the Property (the "Hard Money Loan"). The parties were forced to obtain the Hard Money Loan because they did not qualify for traditional financing. Upon execution of the Hard Money Loan, the parties were aware it required a balloon payment of $302,312.50 in October 2007.

From 2004 to 2007, the parties agreed to do what was necessary to get the Property up to code understanding that it was taking longer than they anticipated. During that time, the rents covered the expenses and David continued to work on the Property. When the Hard Money Loan became due in 2007, the parties agreed to pursue a bank loan for as much as they could borrow to pay off the Hard Money Loan and renovate the Property. Dillon represented that because she had a higher credit score she could get a better interest rate on a bank loan. The parties agreed that Jasmine would quitclaim her interest in the Property to Dillon for the purpose of getting a better interest rate and that the Ramoses would be added back on the loan within 30 days. In June 2007, Dillon obtained a loan from Wells Fargo in the amount of $520,000 in her own

3

name in connection with the Property (the "Wells Fargo Loan"). The Wells Fargo Loan required a monthly payment of $4,731.97 and bore interest at 6.375 percent per annum.

The parties agreed that although the Ramoses were not on the loan or on title to the Property, they would be equally responsible for repaying the loan and maintaining their interest in the Property. Dillon then suggested that the parties should wait before adding Jasmine back on the loan so as to avoid the lender randomly reviewing the loan, discovering a misrepresentation and recalling the loan. Thus, the parties agreed to delay adding Jasmine back on the loan. Dillon, however, reassured the Ramoses that they would eventually be put back on the title.

The parties understood it would cost more than the approximately $200,000 that they cleared from the Wells Fargo Loan after paying back the Hard Money Loan to renovate the Property. The parties agree that David would provide the construction and labor, and that Dillon would use credit cards to pay for materials and expenses. The parties agreed to remove the tenants from the Property to complete the work and understood they would be without income from the Property during this time. The Property was empty and produced no tenant income for 18 months. The parties agreed that they would complete the work, rent the Property, and refinance it to pay off the loan and the credit card debt. The work took longer than the parties anticipated, and Dillon incurred substantial credit card debt. The parties substantially completed the work in April or May 2009, and the first tenant moved in shortly thereafter.

Between at least as early as April 27, 2008 and July 1, 2009, Dillon asked the Ramoses on a number of occasions to contribute cash towards their half of the costs of

4

the repair of the Property. By July 1, 2009, the Ramoses owed $198,640 for their one-half of the costs incurred in connection with the repair of the Property, but were unable to pay these costs. Beginning on or about April 2008 and lasting through August 2009, Dillon provided monthly accountings for the Property to the Ramoses. The accountings from April 2008 through August 2009 reflected that the amount owed by the Ramoses for their one-half of the costs incurred in connection with the repair of the Property was increasing with time.

Because of the Ramoses' financial difficulties and their inability to keep up their obligation with the Property, Dillon suggested a writing as a backup plan to their oral agreement. In July 2009, Dillon prepared an unsecured note which provided among other onerous provisions that it was secured by the Property. The Ramoses read and signed the unsecured note believing it to be a temporary measure as Dillon represented that the Property would be refinanced in six months after demonstrating to the bank a track record of tenant income.

After a bench trial, the court concluded in its interlocutory judgment that the parties had entered into a partnership. It concluded that the unsecured note was unconscionable because Dillon had overwhelming bargaining power as she was Jasmine's boss, she was owed a significant amount of money by the Ramoses, her name was the only one on the title and she presented the note on a take-it-or-leave-it basis. The court concluded that the terms of the unsecured note unreasonably favored Dillon and lacked consideration because the Ramoses were already legally obligated to repay the debt. The court also concluded that the Ramoses signed the note under duress as

5

they were unable to keep up with their obligation to pay half of the expenses and Dillon was Jasmine's boss.

From August 2009 through May 2011, the rents were sufficient to cover the Ramoses' payments under the unsecured note and the court found the Ramoses made payments on the note during this time period. On January 17, 2010, however, Dillon claimed the Ramoses defaulted on the unsecured note because there were insufficient funds to cover their payment for November and December 2009 and she was owed $4,624 on the unsecured note. Dillon demanded that the default be cured by January 22, 2010. By this time, however, the relationship between the parties had already deteriorated.

The court additionally found that Dillon took unfair advantage of her position as title holder to enforce the unconscionable provisions of the unsecured note and this act constituted a breach of fiduciary duty. The trial court ruled that the unsecured note must be reformed to (1) be unsecured and (2) eliminate all unconscionable provisions, including placing one or both of the Ramoses on title to the Property and a bank account. It ordered that the minimum monthly installment amount of $2,074.25 continue under the amortization schedule attached to the unsecured note, but that the amount would be adjusted based on the outcome of a court-ordered appraisal and accounting by mutually agreeable professionals, with the parties equally sharing the cost of the professionals. In lieu of reforming the note, the court gave Dillon the option of purchasing the Ramoses' interest in the Property. Based on its findings, the court found in favor of the Ramoses on their complaint and Dillon's cross-complaint, and named them the prevailing parties.

6

*Further Proceedings and the Final Judgment*

The parties selected an appraiser and accountant. The appraiser estimated the "as is" value of the Property was $898,000 as of July 11, 2012. The accountant issued a draft report, to which the Ramoses objected on the ground errors existed in a number of the line items based on Dillon's misrepresentations. At a hearing held in April 2013, the accountant testified that after more than eight years, the partnership was "pretty close to breaking even."

The Ramoses asked to file additional briefing as they had contributed over $500,000 to the Property. The court noted the property was a "loser," that the Ramoses were seeking a "big windfall" and "if they [got] anything out of [the Property], it's a plus." Nonetheless, the court allowed additional briefing, but denied oral argument. Thereafter, the accountant issued a final report which incorporated changes requested by the court. The final account report concluded that Dillon would need to pay the Ramoses $121,639.68 to purchase their interest in the Property.

The Ramoses filed a posttrial brief electing a damages award based upon Dillon's breach of fiduciary duty. Specifically, they sought return of their "contributions to the partnership" totaling $478,153, consisting of their down payment of $250,000, the value of David's labor at $10,000 per month for 16 months, and the return of a $68,153 cash payment. Dillon opposed the request. In their reply, the Ramoses admitted they were seeking return of their partnership contributions, not future lost profits.

The court issued a final judgment finding that the accounting led to an inequitable result as the Ramoses would recover little and Dillon would be unjustly enriched at their

7

expense. Given the continuing disputes between the parties, the court concluded it would not be practical for them to continue the partnership. Based on Dillon's breach of fiduciary duty, the court found the Ramoses properly elected damages and dissolution of the partnership. It found the unsecured note to be unenforceable and awarded judgment against Dillon in the amount of $478,153 and prejudgment interest which had not yet been calculated. The court explained in a statement of decision that the award consisted of the Ramoses' initial investment of $250,000, a cash payment of $68,153 and David's labor valued at $160,000. The court also reiterated its prior order that the Ramoses be placed back on title to the Property. Thus, while not entirely clear, it appears the trial court awarded the Ramoses all of their damages, plus a half interest in the Property. Dillon timely appealed.

## DISCUSSION

### I. *General Legal Principles*

A partnership is defined as "an association of two or more persons to carry on as coowners a business for profit formed under [Corporations Code] Section 16202, predecessor law, or comparable law of another jurisdiction . . . ." (§ 16101, subd. (9).) "Generally, a partnership connotes co-ownership in partnership property, with a sharing in the profits and losses of a continuing business." (*Chambers v. Kay* (2002) 29 Cal.4th 142, 151.) The Uniform Partnership Act of 1994 (§ 16100 et seq.) "governs all partnerships" after January 1, 1999. (§ 16111, subd. (b).)

Generally, "one partner cannot sue another for money based on the business of the partnership until the partnership has been dissolved and an accounting rendered. The

8

rule is as old as the state, and more." (*Security Pacific Nat. Bank v. Lyons* (1994) 25 Cal.App.4th 706, 711 [citing cases].) This rule is subject to exceptions, including "an action for damages for a tort 'of such a nature that it not only terminates the partnership but wrongfully destroys it, and where the erring partner converts to his own use its entire assets.'" (*Corrales v. Corrales* (2011) 198 Cal.App.4th 221, 228-229 (*Corrales*).) For example, in *Gherman v. Colburn* (1977) 72 Cal.App.3d 544 (*Gherman*), the court noted that where a partner wrongfully repudiated the partnership agreement and converted the assets of the partnership to his own use and benefit, the victim had alternative remedies, including seeking a dissolution and an accounting, or submitting to the repudiation and suing for damages. (*Id.* at pp. 564-565.)

A partnership may be dissolved and its business wound up upon the occurrence of certain events, including when it is not reasonably practicable to carry on the partnership business. (§ 16801, subd. (5)(C).) When a partnership dissolves and is wound up, its assets are first used to pay creditors, with the remainder distributed to the partners in proportion to their interests in the dissolved partnership. (§§ 16801, 16807.) In general, partners are jointly and severally liable for all partnership obligations (§ 16306, subd. (a)), and nothing in the statutes governing the dissolution and winding up of partnerships eliminates or limits that liability (§§ 16801-16807).

## II. *Analysis*

Dillon contends the trial court erred in not addressing her affirmative defense that the Ramoses breached the partnership agreement. Specifically, she contends the stipulation of facts shows the Ramoses breached the partnership agreement by failing to

9

pay their half of the partnership expenses. To aid our review of this issue we requested further briefing from the parties on the following: (1) in light of the trial court's findings in favor of respondents on appellant's cross-claim for breach of the partnership agreement, is it reasonable to imply the trial court rejected appellant's affirmative defense of breach of the partnership agreement; (2) assuming such an assumption is reasonable, does substantial evidence support the trial court's finding in favor of respondents on appellant's cross-claim and affirmative defense; (3) assuming the evidence does not support the trial court's finding in favor of respondents on appellant's cross-claim and affirmative defense, how does this impact the court's remedy; and (4) does Civil Code section 1657 apply regarding respondents' time to pay their share of the partnership expenses. Both parties submitted letter briefs, which we have considered.

In their letter briefs, the parties agree that, in light of the trial court's findings in favor of the Ramoses on Dillon's cross-claim for breach of the partnership agreement, we can imply the trial court rejected Dillon's affirmative defense that the Ramoses breached the partnership agreement. We address whether substantial evidence supported the trial court's implied finding that the Ramoses did not breach the partnership agreement. We answer this question in the affirmative.

Under the substantial evidence standard, we review the entire record to determine whether there is substantial evidence supporting the trial court's factual determinations (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874), viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party, and indulging all

10

reasonable inferences to uphold the judgment. (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254-1255.) The issue is not whether there is other evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trial court. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429-430, fn. 5.) Credibility is an issue of fact for the trial court to resolve (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622) and the testimony of a single witness, even that of a party, is sufficient to provide substantial evidence to support a trial court's finding of fact. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Evidence accepted by the trial court as true may not be rejected by us unless it is physically impossible or its falsity is obvious without resort to inference or deduction. (*Estate of Moore* (1956) 143 Cal.App.2d 64, 72.)

Dillon asserts the trial court erroneously rejected her claim that the Ramoses breached the partnership agreement because a stipulation established that the Ramoses were responsible for 50 percent of the expenses and costs related to the Property. The stipulation established that by July 1, 2009, the Ramoses failed to pay $198,640 for their one-half of the costs incurred in connection with the repair of the Property. The stipulation shows that the Ramoses were obligated to pay 50 percent of the expenses and costs for the Property and that they failed to do so; however, there was additional evidence from which the court could reasonably conclude that the Ramoses failure to pay their 50 percent of the expenses did not constitute a breach of the partnership agreement.

11

Namely, the trial court also heard evidence from Dillon that the Ramoses would contribute their share of the expenses "when it was needed." David testified that he and his wife's 50 percent would come after the Property was refinanced. It was contemplated that the Ramoses would not be writing personal checks to cover their half of the expenses; rather, this money would come from rents collected from the Property. Notably, in July 2009, when the Ramoses approached Dillon to obtain the refinance, the Property was filled with tenants. Moreover, although the trial court concluded the unsecured note to be unenforceable, it found that from August 2009 through May 2011, the rents were sufficient to cover the Ramoses' payments under the note.

Although it was undisputed that by July 1, 2009, the Ramoses owed $198,640 for their one-half of the expenses, there was no evidence presented that these funds were "needed" at the time. Rather, the trial court could have reasonably inferred that, despite Dillon's request that the Ramoses pay half of the expenses, these funds were not needed because as of July 2009, the Property was filled with tenants and generating rent sufficient to cover the Ramoses' payments under the unsecured note. Thus, the totality of the evidence supported the trial court's implied conclusion that the Ramoses did not materially breach the partnership agreement because the agreement included an understanding that the Ramoses would pay their share of the expenses when the funds were needed. Accordingly, the trial court did not err when it impliedly rejected Dillon's affirmative defense. Additionally, Civil Code section 1657 does not apply regarding the Ramoses' time to pay their share of the partnership expenses. (Civil Code section 1657 provides: "If no time is specified for the performance of an act required to be performed,

12

a reasonable time is allowed. If the act is in its nature capable of being done instantly--as, for example, if it consists in the payment of money only--it must be performed immediately upon the thing to be done being exactly ascertained.")

Dillon next argues the trial court erred when it ordered her to pay the Ramoses their partnership contributions as damages and by ordering dissolution of the partnership without complying with the Corporations Code. In turn, the Ramoses argue the trial court appropriately awarded them damages instead of dissolving the partnership because Dillon improperly converted all of the partnership assets. We first address the Ramoses' argument and then explain the trial court erred when it awarded the Ramoses damages.

The Ramoses rely on *Gherman*, *supra*, 72 Cal.App.3d 544 to support their argument that they could elect a damages remedy. In *Gherman*, a jury found, among other things, that defendants had wrongfully repudiated or breached an oral joint venture agreement, converted all of the joint venture assets to themselves and excluded plaintiffs therefrom, and that plaintiffs suffered damages. (*Id.* at pp. 556-557.) In this situation, the appellate court concluded that plaintiffs had a choice of remedies, including (1) waiving the tort or breach and suing to specifically enforce the partnership or joint venture agreement, including the remedy of a judicial dissolution, (2) submitting to the repudiation and suing for damages, or (3) suing in tort. (*Id.* at pp. 564-565.)

There is a major problem with the Ramoses' argument regarding the propriety of the damages award; namely, the trial court never found that Dillon repudiated the partnership agreement. The trial court found in its interlocutory judgment and reiterated in its final judgment, that Dillon breached her fiduciary duty by enforcing

13

unconscionable provisions of the unsecured note. Although the Ramoses alleged in their complaint that Dillon had repudiated the existence of the partnership and converted the partnership assets, there is no finding by the trial court that Dillon wrongfully repudiated or breached the partnership agreement and converted all of the partnership assets to herself. Accordingly, this is not a *Gherman* situation where the Ramoses could submit to the repudiation and sue for damages without seeking dissolution of the partnership. (See also, *Navarro v. Perron* (2004) 122 Cal.App.4th 797, 800, 802 [a partner's *repudiation* of partnership's existence allowed the aggrieved partner to elect his or her remedies and sue for damages without seeking dissolution].) Rather, this case is more akin to *Corrales* where dissolution, not damages, was appropriate for a breach of fiduciary duty that did not amount to a repudiation of the partnership. (*Corrales*, *supra*, 198 Cal.App.4th at pp. 228-229.)

We next address the trial court's remedy for Dillon's breach of fiduciary duty. The trial court recognized in the final judgment that "it would not be practical for the parties to continue the partnership" and stated dissolution of the partnership was the "just and proper remedy." (§ 16801, subd. (5)(C) [a partnership may be dissolved where "[i]t is not otherwise reasonably practicable to carry on the partnership business"].) While not entirely clear, we interpret these statements as an order that the partnership be dissolved. As a preliminary matter, the Ramoses state they did not elect a dissolution. To the extent the Ramoses assert the court lacked authority to order dissolution, we note they are the respondents and did not file a cross-appeal. (*Kardly v. State Farm Mut.*

14

*Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1749, fn. 1 ["A respondent who fails to file a cross-appeal cannot urge error on appeal."].)

Dillon contends, and we agree, the trial court erred when it dissolved the partnership without complying with the Corporations Code. A partnership may be dissolved where "[i]t is not otherwise reasonably practicable to carry on the partnership business." (§ 16801, subd. (5)(C).) When a partnership is dissolved and its business wound up, the assets go first to pay the creditors, including partners who are creditors, and any surplus assets are generally liquidated and distributed to its members. (§ 16807, subds. (a), (b).) Generally, "until the affairs of a partnership are wound up, the claim of a partner is equitable and can only be enforced in an accounting action, and that no personal judgment can be entered in such an action until all partnership assets have been converted into money, the debts paid and a final balance ascertained." (*Driskill v. Thompson* (1956) 141 Cal.App.2d 479, 482.) As one legal treatise explained, "the claims of partners for reimbursement of contributions to capital, or disbursements on behalf of the partnership, or repayment of debts of the partnership to them are primarily against the partnership assets, and a personal judgment against individual partners should not be rendered unless the partnership assets are insufficient to make repayment." (68 C.J.S. Partnership § 552, p. 725, fns. omitted.)

Here, the trial court ordered dissolution of the partnership without complying with section 16807. This is error. Accordingly, the judgment must be reversed and the matter remanded for the court to fashion an appropriate remedy based on its finding that Dillon

15

breached her fiduciary duty to the Ramoses.  As an aside, we note that where, as here, the partnership was not making a profit, dissolution may result in a seemingly unjust result for all parties.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court for further proceedings in accordance with this opinion.  Appellant is awarded her costs on appeal.


McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.