Filed 11/1/21  P. v. Moreno CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B304632 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA100878) |
| v. | |
| NOE MORENO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith L. Meyer, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Noe Moreno (defendant) appeals from his conviction of sex crimes committed against children under the age of 14 years. He contends that the trial court erred in denying his motion for mistrial or in the alternative to discharge jurors who shared and laughed at a comic strip. Defendant also contends that it was an abuse of discretion to exclude evidence of one child's false accusation offered to prove that another child's accusation was false. Finally defendant asks that a life sentence on count 5 be set aside and the matter remanded for resentencing to a determinate term. We find no merit to defendant's contentions and no need for resentencing on count 5, as it was a determinate term of 12 years. We thus affirm the judgment.

Defendant was charged by amended information with six counts of lewd act upon a child in violation of Penal Code section 288, subdivision (a),[1] as follows: count 1, against Erika M.; count 3, against S.A.; and counts 4, 8, 9, and 10, against Rosa P. Defendant was also charged with one count of continuous sexual abuse of a child (count 5), in violation of section 288.5, subdivision (a), and one count of aggravated sexual assault— sodomy of a child (count 6), in violation of section 269, subdivision (a)(3). In addition, it was alleged as to counts 1, 3, 4, 5, 8, 9, and 10 that the crimes were committed against more than one victim, within the meaning of section 667.61, subdivisions (b) and (e).

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

Defendant was found not guilty of counts 1, 4, 6, and 10, and guilty of counts 3, 5, 8, and 9, as charged.[2] The jury found true the multiple victims allegation as to counts 3, 5, 8, and 9. On January 31, 2020, the trial court sentenced defendant to three consecutive terms of 15 years to life in prison as to counts 3, 8, and 9, for a total of 45 years to life. The court struck the section 667.61 multiple-victim allegation as to count 5[3] and sentenced defendant to a concurrent middle term of 12 years on that count. The court imposed fines and fees and calculated the combined presentence custody credits as 2,164 days.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

### *Rosa P. (Counts 4, 5, 8, 9, 10)*

Rosa testified that she was born in 1994, her mother was Yadira P., and that defendant was her mother's ex-husband. Rosa described the earliest incident she remembered, which occurred when she was four or five years old. She had grabbed defendant's stomach in order to climb over him to go to the bathroom. Defendant claimed that she had touched his penis, and from that he knew that she was curious. Rosa testified that she does not know whether she touched his penis.

After that there were many incidents. She recalled one time, when she was around seven years old, her mother was not home. Rosa was on her bunk bed not wearing clothing.

---

[2]     The amended information was filed after count 2 was dismissed under section 1118.1 and did not contain a count 2 or 7.

[3]     Section 288.5, subdivision (a) was not subject to the multiple-victim provision at the time of the offense.

Defendant rubbed his penis on the outside of her vagina. He did not penetrate her, explaining that if she had a medical examination, doctors would be able to tell. Another time when she was about seven or eight, she and defendant were in her room, and her cousins were outside the bedroom. Defendant sat on the floor leaning against the door so it could not be opened. He wanted her to perform oral sex so he could ejaculate and would not let her leave. She complied and placed her mouth on his penis. When she was nine or 10 years old, Rosa was in the car while defendant was driving. He took down her pants and underwear, put his finger in her vagina, and was happy and excited that he was able to put his finger all the way in. Rosa testified that another time when she was around 10 years old and was not wearing pants or underwear, defendant grabbed some lotion and put his penis in her butt. From the time that Rosa was six or seven years old until she was about 12 or 13, defendant would have her orally copulate him or he would orally copulate her. It happened often and seemed to Rosa that it happened all the time.

When Rosa was about nine, she thought she was pregnant because her stomach was hurting and felt sick. Defendant purchased a pregnancy test, which she used in a McDonald's restroom while her brother was in the restroom, and defendant waited outside. The test was negative.

When Rosa was 10 or 11 years old, defendant and Yadira separated and defendant was in a relationship with Erica C., who had two daughters, S.A. and Ebony. Rosa remembered being at Erica's house when Erica called her into the room where she and defendant were having sex, told Rosa to sit on the bed next to him, tried to kiss her, and told her to remove her clothes. Defendant told Rosa to go to the bathroom and clean herself

4

because she smelled bad. When she returned, Erica put Rosa's hands on her breasts. Erica then became upset and told Rosa to get dressed. When Rosa was about 12 or 13 years old and she was at defendant and Erica's apartment, defendant and Erica were having sex. Defendant told Rosa to put her finger in Erica's vagina while his penis was there. Rosa complied but could not remember anything else.

When Rosa was nine or 10 years old, defendant found out that social workers had been called and came to the house. Defendant said he thought that he was going to have go away, so he told her to remove her clothes. He then rubbed his penis on her vagina, pushing it partially inside Rosa. When she was around 13 years old, defendant picked up Rosa from her mother's house in his Tahoe truck, which he parked near some trees, and took her into the third row seat with the middle seat pushed down. He penetrated her vagina with his penis and told her to call him "baby." Around Christmastime 2008, when Rosa was at defendant and Erica's apartment, defendant woke her up, took her to another room, and while she was feeling foggy, he penetrated her vagina with his penis. It was all a blur, so later she asked him if he had done anything, and he smiled and winked at her.

Rosa testified that defendant is uncircumcised and has only one testicle. He told Rosa that he had warts on his penis, which he had burnt off, and there were little round burn marks over the top part of his penis.[4] Defendant told Rosa to have sex with

---

[4] Photographs of defendant's genitals were taken while he was in custody. They show that he was uncircumcised and had just one testicle, but did not show warts or scars.

5

someone her age so that she could get checked for warts and tell her mom that she had sex with a boy, not him.

Rosa did not tell anyone about the abuse because she was afraid. Defendant had told her that her mother would be taken away, that the children would be taken away, and she would never see them. Defendant would also fight with her mother and tell Rosa it was her fault that they fought. On several occasions, when she told detectives or social workers that there had been no sexual incidents with defendant, it was not true. Rosa remembered that a social worker came to their house in January 2003 when she was about eight years old. Rosa told her that everything was okay, she felt safe, liked living with her parents and playing with her dad, and that no one had ever touched her inappropriately in her private parts. She said that if anyone tried to do so she would kick them in the face or shove a sharp pencil in their mouth, and would tell her mother or father. About a month later a police officer came to talk to her. Rosa told the officer that no one had ever hurt her or touched her inappropriately, and defendant had never touched her in her private area. In April 2007 when she was 12 years old, another social worker talked to her, and again Rosa did not report anything. In February 2013 she did not report the abuse because she did not want her brother and sisters to be angry with her.

Rosa also denied to her mother that anything had happened. She lied because she was afraid her mom and siblings would be taken away and did not know what would happen. Once, sometime after the incidents involving Erica, she asked Erica to help her, but Erica told her not to let defendant continue to do things to her. When Rosa was about 12 or 13, she was having dinner with the family at defendant and Erica's home when Erica said, "Don't grab that food because he will make you

have sex with him for it." Rosa thought Erica was a little bit crazy.

It was in early 2013 when Rosa, then about 18, first told anyone about these incidents. Police officers stopped her boyfriend's car while she was with him, and she felt comfortable with them. She walked away a bit with one of them and asked how to make a report. He explained it to her and told her it was never too late.

Rosa testified that she suffered a lot of anxiety, and it was difficult seeing defendant and talking about what happened. She felt emotional testifying, called him a "terrorizer" and blamed him for her mother's attempted suicide.

### S.A. (Count 3)

S.A. testified that defendant was her father, although she did not know that he was her biological father until she was 10 years old and they obtained a DNA test. Prior to that she thought her older sister's father was her father. S.A. was born in 2000, her older sister is Ebony, her mother is Erica C., and she has two younger siblings.

S.A. testified that defendant touched her in an inappropriate manner one night in 2008, when she was about seven or eight years old. Her mother was at work and S.A. was asleep in her room on the top bunk without a blanket. In the middle of the night defendant entered, climbed up to the top bunk, sat at the top of the bunkbed stairs, pulled down her underwear, and touched her. Ebony was on the bottom bunk and her younger siblings were sleeping in the living room. He pulled her underwear down slowly, then put his hand on the outside of her vagina. She felt his bare hand stroking her skin upward, downward, and around. It seemed to last about 10 minutes. During the entire time, she pretended to be asleep.

7

A couple weeks later, S.A. told her counselor at school what had happened. After that, she told her mother about the touching, and Erica was upset. A few months later, she told the social workers that nothing had happened, because she was afraid that her family would be broken apart if she told the truth. S.A. is close to her sister Ebony. They share secrets, but she did not tell Ebony that defendant had done something to her.

The family was followed by the Department of Children and Family Services (DCFS) for about a year and a half around 2007 and 2008, and they went to court several times. The children had court-appointed counsel. Erica and defendant argued quite a bit, and S.A. saw her mother throw or break things during arguments, which scared her. She would hear her mother say, "You can't tell me what to do, you're a molester." Erica often called defendant a molester when they were arguing. S.A. met regularly with caseworkers and social workers, and defendant moved out of the house for a while. S.A. did not miss him when he moved out and did not want him back. S.A. recalled telling a caseworker that nothing had happened between her and defendant, but she did not recall talking to other social workers in 2008. She testified that she lied to them because she was afraid she would be taken away from her parents.

As she got older S.A. and defendant argued a lot. He did not allow her to have boyfriends, which she did anyway. Erica was more lenient and knew about the boyfriend. After defendant installed a monitor on her phone in or around 2014, he discovered that she had sex with a boy and was "sexting" him. She was angry at being caught, because she liked the boy. Defendant was upset, took her phone away, and did not allow her to go outside.

After defendant was arrested in December 2014, S.A. spoke to one of the officers and talked about what happened in 2008.

8

### Erika M. (Count 1)

Erika testified that she was born in 2004, that her mother is Erica C. and that defendant is her father. She recounted a 2014 incident when she was about 10 years old. She was on her parents' bed with her brother and parents watching a movie. She was between her parents, defendant was on her right, her mother on her left, and her brother was left of her mother. She fell asleep and was awakened when she felt a hand on her lower abdomen near her pelvis moving downward. When she woke up and moved a bit, defendant, who was awake, moved his hand. Then she felt it again. It felt weird and she was confused so she left and went to the living room to sleep. Erika told her mother about it a few days later when they were in the car with S.A., Ebony, and her brother. Her mother called the police and defendant was arrested that day.

### Testimony of Erica C.

Erica testified that defendant was the father of her daughters S.A. and Erika as well as a younger boy. She and defendant were together six or seven years, off and on. They argued a lot and separated a few times. After some arguments they would not speak to each other for up to a week. Sometimes she threw things during their arguments, and sometimes she would physically hit and punch herself when angry or upset. She sometimes called defendant a child molester but did not think the children heard her. Erica and the children moved out of the home for two years when DCFS came to investigate after receiving anonymous calls regarding inappropriate touching. She and defendant went to counseling, and she moved back in gradually over a two-year period. Erica did not remember what year it was that she learned from social workers that S.A. had reported inappropriate touching at school. She asked S.A. and

Ebony about it, but S.A. did not want to disclose exactly what defendant had done, and then she denied it.

Three telephone calls, which defendant placed from the jail to Erica, were recorded and played during her testimony. In the first call, defendant said to Erica, "I just wanted to apologize for putting you through so much and, uh, I got a, I don't know, I got, I got a lot of stuff that I can't understand about myself and, and, uh, I don't know, I just, I just wanted to let it out and clear it up and, uh, just face it, you know, face everything."

After defendant spoke some more, Erica said, "I just don't understand why would you, that's our little girl, Noe, I don't understand that." Defendant explained that he fell asleep while watching the movie and "whether it's subconsciously or purposely . . . I realize at the end, you know, that there's . . . this has been an ongoing, uh, I don't know, just ongoing stuff . . . . I didn't intentionally, uh, look for anything to, to, uh, to do that to the little girl for purposes of, you know, uh, you know, like what I was telling the cop, uh, getting off or anything like that, but, uh, if I hurt, uh, anybody, the little kids or anybody, uh, with anything that I consciously did or not, uh, it's, that's what's important, that I, you know, face it." Erica told defendant that "even though what . . . occurred with [S.A.], . . . you were saying that it wasn't true and all this stuff, and then we went through the court and we went through the counseling . . . and you seen that it was still affecting [S.A.]." Defendant replied, "Yes, I know, because, uh, you know, uh, I know all that, this is something that, uh, you know, has been with me for the person that I have been for years and years and years and stuff like that too, you know, and this is something, like I said, that I don't understand."

Defendant then explained to Erica "that there's a difference between, you know, doing something for the intention of getting

10

off, and, and, and, you know, doing something innocently and stuff like that, and we fell asleep and, uh, you know, uh, I'm not going to say that I didn't do that. I cannot say that, because obviously I'm not going to say that she was lying or anything like that. I am going to figure and accept whatever comes about it, because if I, if I hurt her, or she felt like, you know, she was violated, uh, then that's what has to be, because, uh, it is, you do have the right, that is my little girl, uh, I'm just afraid that, you know, what's going to happen in the future when all this is over and I can't . . . may or may not see my kids and stuff like that, and, uh, you know, I feel like, uh, I don't know, at the end what's really going to, I don't know, uh, you know, how much time I'm going to be here."

In the second call, defendant again apologized and said he had to accept responsibility. He said, "I'm not going to contest my little girl," and "I'm not going to make excuses." In the third phone call, defendant said, "I'm sorry if I, if I, if I ruined, uh, you know, a lot. These are my actions, I, I ruined a lot, you know." Defendant explained, "I didn't do it with the intentions of anything. You know, we were watching TV and you know I always like to hold her, and stuff like that, and I might have been asleep, uh, during that time, but it was for no reason, no purpose, for, for, you know, getting up, but I'm not going to say that I didn't do it, and that's it, you know."

**Defense evidence**

Erica testified for the defense that she had a good relationship with Rosa and became aware of her allegations against her after defendant was arrested. Erica denied Rosa's claim about watching her and defendant have sex and including her in sexual activity ever happened. She denied that she and Rosa had any discussion about sexual encounters between

11

defendant and Rosa, although Erica asked Rosa more than once if there had been such encounters, which Rosa always denied. Erica also asked Yadira a couple times, and Yadira claimed that Rosa said nothing had happened. Erica did think it was odd that Rosa and defendant were on the computer late at night two or three times when Rosa was around 13 years old.

Erica described a hostile relationship with Yadira, adding that Yadira had alleged so many things against her that the accusations against her did not come as a surprise. Erica claimed that she tried to be friends or at least civil, but Yadira resisted. Over the years Yadira had made all kinds of accusations against Erica and her children.

The defense called Ebony, who identified defendant as her stepfather, Erica as her mother, and S.A. and Erika as her younger sisters. Ebony described her relationship with S.A. as close, like best friends. Although she did not dislike defendant at first, she has come to dislike him because of things he has done, choices he has made, including his way of disciplining. Ebony was asked to recount the incident that occurred when defendant took Ebony and S.A. to a drugstore when he suspected that they were using drugs. They had not used drugs, but Ebony was not upset about the accusation. She was upset that defendant was accusing them in public, which embarrassed her and made her feel bad. Ebony told him it was embarrassing, that he was going to make her hate him, which she did not want. S.A. also seemed to be upset and embarrassed. Defense counsel asked whether Ebony said, "If you test [S.A.] I'll call the police and you will see what I do." Ebony did not recall saying that and did not think she would have used that against defendant for something so little.

The defense called several social workers who had contact with the families. Victor Blackwell, who investigates child abuse and neglect, spoke to S.A. and thought she seemed sincere in her denials, though he acknowledged that some children falsely deny abuse. Olivier Padilla testified that she spoke to four children, a boy, Erika, S.A., and Ebony; and S.A. denied being abused by her father or sexually abused. Padilla saw no indication that she was being evasive or untruthful. Armando Carrasco met with Erica and her children monthly for about a year in 2008 and 2009, during which time he spoke to each child and Erica individually. S.A. did not disclose sexual abuse by her father. Lizette Carmona was called to Rosa's home in January 2003, to investigate allegations of sexual abuse, which Rosa denied. Carmona observed no cues that Rosa was not forthcoming or honest. When Maria Parra interviewed Rosa in April 2007, Rosa did not disclose any allegations of sexual abuse. Rosa claimed that she and defendant were close and that she was still in contact with him although she did not live with him. Rosa said that Erica disliked that she and defendant were close, and she expressed concern about how Erica treated her own children. The parties stipulated that other social workers and a detective would give similar testimony about the children's denials.

Bradley McAuliff, a psychology professor and adjunct law professor testified as an expert in the suggestibility of children and forensic interviewing. He explained that a suggestible witness was not the same as a witness who lies. A suggestible child might have a memory about an event that never happened.

Defendant testified that Rosa was about six months old when he first met Yadira, and during their 10-year relationship they had three children together.

13

Rosa was a beautiful, smart and funny child who always had a smile. Defendant claimed they had a great relationship as she grew, until around the age of 13, when Rosa changed her attitude, stopped calling him dad, and started calling him fool and dog. She then began to dress differently, talk back, and rebel; and he could no longer discipline her. She was blunt about things, would steal, and throw a tantrum if he told her what to do. This was after his separation from Yadira. Before that she was fine while they were together.

Defendant and Yadira argued frequently. She was unfaithful, stole from his wallet, and would leave with the children, sometimes for weeks at a time. Defendant stayed with her because he was terrified to be alone and suffered from anxiety and depression for which he took medication and saw a therapist. Defendant was happy when Erica came into his life. He and Yadira reconciled at some point and had a son. Eventually defendant "wasn't having it anymore" and moved in with Erica. Erica had reconciled with her husband, Ebony's father, until he went to prison. She then came back into defendant's life when S.A. was about four years old. Erika was born in 2004 and later their son.

Defendant and Erica lived separately for about two years when DCFS was involved. Otherwise their separations after arguments were short—a week at the most. Eventually their arguing caused defendant to think he was at the point of a mental breakdown, having thoughts of hurting people who hurt him and about suicide. He did not feel in command of his household. He felt he was being bullied by the three "women" who were "running" his home. In addition to Erica, the women were S.A., who was then nine or 10 years old, and Ebony, who was about 16. Erica was physically and verbally abusive and the

girls were disobedient when he tried to implement rules. Erica punched herself when he confronted her about cheating, and he would end up apologizing to make her stop. When he was alone he would replay in his mind their attacks on him. It was traumatic and brought on strong feelings of fear and anger, as well as thoughts about hurting them. This abuse at home continued for years and years.

Defendant put a monitoring application on Ebony's and S.A.'s phones so he could see their texts, online searches, and who they were calling. He also put the application on Erica's phone because of "[o]ur history of infidelity, trust. And you know, just the bad relationship." When defendant saw that S.A. was sexting a boy and looking at marijuana Web sites, he monitored her more and implemented rules that caused her to further resent him. Defendant was a nervous wreck wondering what S.A. was capable of doing if he were not monitoring her.

As to Erika's allegations against him, defendant said they were "ridiculous" and, "That's all I have to say."

Defendant claimed that his apologies in the telephone calls from jail were about his relationship with Erica and his intention to work on it, to try to change, and to work on his insecurities and trust issues. He knew she was accusing him of misconduct with Erika and did not deny it because he had learned that it was never a good idea to contest her. He had learned de-escalation tools in therapy and that was what he was trying to do in the telephone calls. Defendant claimed that he did not inappropriately touch any of his children.

The divorce from Yadira was pending when Rosa went to the police. They were fighting about money, child support, custody, and visitation. Defendant described the incident at the drug store three weeks before his arrest, and claimed that Ebony

screamed, "If you test [S.A.], I will call the police and you will see what I will say." Defendant again claimed that he was being bullied by the women.

Defendant claimed that everyone in the family knew that he had one testicle due to a surgery in his 20's, and it was common knowledge that his family did not circumcise. He never spoke to Rosa about it and did not know how she knew. Defendant claimed that nothing of a sexual nature ever happened with S.A. or Rosa.

## DISCUSSION

### I. The cartoon

Defendant contends that the trial court erred in denying his motion for mistrial or, in the alternative, to discharge jurors who shared and laughed at a comic strip that one of them cut from the Los Angeles Times.[5] It depicts a courtroom with a jury, judge, defense counsel, and a defendant who is depicted as a large grinning clown. The jury foreman is standing, reading from a paper, "We find the defendant really creepy and don't care if he's crying on the inside." The caption reads, "Easiest jury service ever."

Defendant asserts that sharing and laughing at the comic strip was misconduct and that it was serious enough that prejudice must be presumed.

We agree with the People that the sharing of the cartoon was not misconduct. "[I]n the absence of misconduct, the burden remains with the defendant to demonstrate prejudice under the

_____

[5] The "Non Sequitur" comic strip, published in December 2018, was not in the appellate record, but we have taken judicial notice of a copy of it at defendant's request.

16

usual standard for ordinary trial error." (*People v. Gamache* (2010) 48 Cal.4th 347, 397.)  Prejudice is presumed only from actual misconduct or "'true jury misconduct.'" (*People v. Cooper* (1991) 53 Cal.3d 771, 835; *People v. Chavez* (1991) 231 Cal.App.3d 1471, 1484-1485.)  Juror misconduct occurs when an "overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors." (*In re Hamilton* (1999) 20 Cal.4th 273, 294.)  The receipt of outside information is misconduct when it relates to the pending case. (*In re Carpenter* (1995) 9 Cal.4th 634, 675.)  It is not misconduct when it is unrelated to any issue in the case, even when it concerns the jury process. (Cf. *People v. Page* (2008) 44 Cal.4th 1, 58-59 [jurors shared cartoon lampooning the length of jury service].)

Here, the cartoon was related to the trial process, but not to defendant's case or any issue in the case.  The burden thus remains with defendant to establish prejudice under the usual standard for ordinary trial error.  The decision whether to grant a mistrial or motion to discharge a juror due to alleged misconduct is committed to the sound discretion of the trial court. (*People v. Peterson* (2020) 10 Cal.5th 409, 476.)  A ruling on a motion for mistrial is reviewed for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala* (2000) 23 Cal.4th 225, 283.)  We defer to the trial court's factual findings if they are supported by substantial evidence. (*Id.* at pp. 283, 299.)  "'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or

patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

The trial court took a poll of the jury, found that every juror had read the cartoon, and then questioned each one individually. All jurors said they did not consider defendant a clown and understood that defendant was still entitled to the presumption of innocence. The trial court heard argument of counsel and denied the motion. The court found no misconduct, as the cartoon was not about the case.

Defendant argues that only Juror No. 11 was "honest with the court that the comic was related to [defendant's] case." We disagree with defendant's characterization. Juror No. 11 *speculated* that the cartoon was passed around with the intent to compare it with this case and thought it was inappropriate but told the court that there was no such discussion among the jurors, and Juror No. 11 did not equate it with this case.

We reject defendant's suggestion that the jurors lied to the court about how the cartoon affected them. When defendant renewed the issue in his motion for new trial, the trial court stated:

> "The court was satisfied that we still had an independent and objective jury based on their demeanor, which is not often reflected in the court record. I adjudged their demeanor [and] their character. I looked at each juror. . . . I'm making this record very specific because I don't want the appellate court to second-guess me on my judgment as to whether I think jurors were telling the truth to me on their opinion or feelings or how much credence they gave to this cartoon. So when . . . I interviewed all the jurors, I felt that [they] were being truthful with me and honest with me, . . . [¶] . . . and that

18

this cartoon was going to have zero effect on the verdict."

We defer to the trial court's determination of the jurors' credibility and reject defendant's speculation that the jurors lied. Defendant also argues that an unnamed juror's frustration with the length of the trial demonstrated a negative attitude of all the jurors caused by the cartoon (rather than simply the length of the trial, apparently). Speculation cannot establish prejudice. (*People v. Williams* (1988) 44 Cal.3d 883, 933.)

Relying upon his claim that prejudice is presumed, defendant fails to demonstrate that absent the sharing of the cartoon, a different result was reasonably probable. To establish an abuse of discretion, a defendant must show that the ruling "resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) A miscarriage of justice occurs when it appears that a result more favorable to the appealing party would have been reached in the absence of the alleged errors. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see Cal. Const., art. VI, § 13.) It is the defendant's burden to establish "a reasonable probability that error affected the trial's result." (*People v. Hernandez* (2011) 51 Cal.4th 733, 746.)

No such probability appears here. Defendant argues that prejudice is shown by the not guilty verdicts on some counts and guilty verdicts on others, which, he asserts, indicate compromise verdicts. Without other evidence of compromise we must presume that the jury faithfully performed its duty. Acquittal on one count is not evidence that the guilty verdict on another was a compromise. (*People v. Root* (1952) 112 Cal.App.2d 122, 126; see *People v. Taylor* (1948) 88 Cal.App.2d 983, 987.)

Furthermore we agree with the People that the evidence against defendant was overwhelming. Rosa described in detail

19

nine specific sexual offenses that defendant committed against her, including rape, over a period of approximately six years. Rosa also testified that during that same period it seemed that he imposed separate incidents of oral copulation on her "all the time." S.A. described how defendant stroked her vagina for 10 minutes when she was six or seven years old.

Defendant acknowledged in the three phone calls with Erica that he committed the acts against S.A. Defendant apologized to Erica for what he did to their daughters and admitted that he committed the acts "whether it's subconsciously or purposely." Defendant knew how it had affected S.A, "because, uh, you know, uh, I know all that, this is something that, uh, you know, has been with me for the person that I have been for years and years and years and stuff like that too, you know, and this is something, like I said, that I don't understand." Defendant explained that "there's a difference between, you know, doing something for the intention of getting off, and, and, and, you know, doing something innocently and stuff like that, and we fell asleep and, uh, you know, uh, I'm not going to say that I didn't do that. I cannot say that, because obviously I'm not going to say that she was lying or anything like that."

In light of defendant's admissions and the testimony of his victims, if we found the alleged misconduct in error, it would be harmless under any standard.

## II. Exclusion of impeachment evidence

Defendant contends that the trial court erred by excluding "crucial testimony impeaching a witness, deeming it irrelevant that the witness admitted to multiple investigators that she invented allegations to get [defendant] in trouble." (Capitalization and boldface omitted.)

20

Defendant brought up the issue twice. First, defendant sought to have the court admit evidence of an interview in which Ebony admitted that she had lied about defendant having inappropriately touched her because she wanted to get him into trouble, and added that her description of the touching was identical to that given by S.A. Defendant claimed that Ebony said to him, "You are going to see what I am going to do to you."

Although the initial wording of defendant's contention on appeal suggests that the purpose of the evidence was to impeach Ebony, defendant then makes clear that he wanted to impeach *S.A.'s* testimony, which is how the trial court construed the request. Defendant explains that the purpose of the evidence was to show that the children were willing to invent false accusations against defendant. The court ruled that without evidence that S.A. and Ebony conspired or even discussed the details of S.A.'s experience, the evidence would be hearsay and irrelevant to S.A.'s state of mind.

Defendant brought up the issue a second time just before Ebony testified for the defense. Before court that day defense counsel interviewed Ebony and informed the court that she denied that S.A. described the touching to her or that she and S.A. ever had had a conversation about concocting a story in order to get defendant into trouble. Ebony claimed that she overheard S.A. describing the abuse to a police officer. Counsel explained that the closeness of the sisters suggested a willingness to make these allegations against defendant just because they were angry with him. The court found that the defense had not shown how Ebony's state of mind would be probative of S.A.'s state of mind, and the court again excluded the testimony.

"We review a trial court's ruling excluding evidence on grounds of irrelevance (Evid. Code, § 350) for abuse of discretion.

21

""The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence."""" (*People v. Thornton* (2007) 41 Cal.4th 391, 444.) We may not disturb the trial court's ruling on the admissibility of evidence "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.'"" (*People v. Heard* (2003) 31 Cal.4th 946, 973.)

Defendant argues that Ebony's testimony that she had invented her story was central to the defense theory that S.A. had lied about her allegations, and Ebony's testimony would thus impeach portions of S.A's testimony. He asserts that the similarity of their allegations and Ebony's willingness to lie lent significant support to the inference that S.A. was also willing to lie and had also invented her allegations.

Defendant was unable to produce evidence of any communication between the sisters regarding what defendant did to S.A., or any statement by S.A. suggesting that she falsely accused defendant. We construe defendant's reasoning essentially as follows: Ebony lied by claiming that defendant did the exact same thing to her as he did to S.A.; Ebony loves her sister S.A., S.A. loves her sister Ebony, and the sisters are close; ergo, S.A. lied. Defendant's reasoning is faulty. In general,

22

"speculation regarding the state of mind of another person [is] both incompetent and irrelevant." (*Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 582.) Testimony regarding the state of mind of another person is speculative unless it is supported by "'proper evidence of such state of mind such as declarations or conduct.'" (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1470, quoting *Gherman v. Colburn, supra*, at p. 582.) Thus it cannot be said here that "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner . . . .'" (*People v. Goldsmith, supra*, 59 Cal.4th at p. 266.)

Nor has defendant shown that the ruling "'resulted in a manifest miscarriage of justice.'" (*People v. Goldsmith, supra*, 59 Cal.4th at p. 266; see Evid. Code, § 354.) Defendant merely argues that the ruling violated his constitutional right to due process, and thus review is required under the standard of *Chapman v. California* (1967) 386 U.S. 18, which requires the People to demonstrate that the error was harmless beyond a reasonable doubt. As defendant did not make a due process argument below and we find no error, there has been no constitutional error that must be reviewed under the *Chapman* standard. (*People v. Thornton, supra*, 41 Cal.4th at p. 443.)

Nevertheless, as explained in relation to defendant's argument concerning jury misconduct, we find the court's ruling, if error, harmless under any standard. In a telephone call from the jail defendant apologized to Erica for committing the acts against their daughters, and admitted that he committed the acts "whether it's subconsciously or purposely." When Erica responded, "I just don't understand why would you, that's our little girl," she was clearly speaking of S.A. Erica named S.A. when she told defendant that even though going through counseling, he saw "that it was still affecting [S.A.]." Defendant

replied, "Yes, I know, because, . . . this is something that . . . has been with me for the person that I have been for years and years and years and stuff like that too, you know, and this is something, like I said, that I don't understand." Defendant offered that he fell asleep while watching the movie and "whether it's subconsciously or purposely . . . I realize at the end, you know, that . . . this has been . . . ongoing . . . ."

Not only did defendant admit his abuse of S.A., the abuse took place when S.A. was about seven years old and defendant believed she was his stepdaughter. Defendant began abusing Rosa when she was seven years old. Rosa's testimony regarding defendant's abuse was detailed and compelling. Evidence of other sexual offenses can be highly probative of defendant's propensity to commit such acts, particularly where the crimes or victims are similar, such as "unsolicited sexual advances against young female children with whom he has a close familial connection while they are entrusted to his care" (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 967), or "molest[ing] a 12-year-old stepdaughter, then a 12-year-old step-great-granddaughter" (*People v. Branch* (2001) 91 Cal.App.4th 274, 285; see Evid. Code, § 1108).

In sum, if the court had erred, we would find it harmless beyond a reasonable doubt.

## III.  Count 5 sentence

Defendant contends that a life term under section 667.61, the "One Strike Law," was unauthorized for count 5 because a violation of section 288.5 was not added as qualifying offense until 2006, whereas the count 5 offense spanned a period ending in 2003. Defendant asks that sentence on count 5 be set aside and the matter remanded for resentencing to a determinate term.

24

Remand is unnecessary.  The trial court struck the section 667.61 multiple-victim allegation as to count 5 and sentenced defendant to a concurrent middle term of 12 years on that count.

## DISPOSITION

The judgment is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.